[No. 1458.]

## William Hogan *v*. The State.

Murder—Evidence.—See evidence in this case *held* insufficient to sustain a conviction for murder in the second degree, because it fails to inculpate the defendant in the assassination.

Appeal from the District Court of Nacogdoches. Tried below before the Hon. P. F. Edwards.

The indictment was for the murder of Abner Craig, in Nacogdoches county, on the tenth day of July, 1882. The jury returned a verdict of guilty of murder in the second degree against the appellant, and assessed his punishment at a twenty years' term in the penitentiary.

Doctor John Fears was the first witness called by the State. He testified that between midnight and day on the tenth day of July, 1882, he was called to the residence of William Craig, to attend his son Abner Craig, who was suffering from gunshot wounds. He found one wound in the left side of Abner Craig's head, which appeared to have been inflicted by a missile between a low mould buck shot and turkey shot in size. He found another wound in the neck, above the left collar bone. This wound was made by a buck shot. Another wound, from which the witness extracted a squirrel shot, was found in the wall of the belly, and still another wound, from which the witness extracted a turkey shot, was found near the nipple. Abner Craig died from the effects of the wound in the left side of his head. He was delirious from the time the witness first saw him until his death, which occurred on the fifteenth of July, 1882. The other wounds mentioned were not fatal.

William Craig, testifying for the State, described the location of his house, on the gallery of which the killing occurred, as follows: "Mine is a double log house with a long gallery in front. It sits east and west, and the gallery is on the south side. Twenty feet south from the gallery is a plank fence which enclosed the house in front. On the west is a rail fence running north and south, enclosing the yard and dividing it from a field

west from the house. An enclosed orchard lies south of and across the road from the house; the north fence of which, and the south or front plank fence enclosing the house, form a lane in front of the house. The field lying north of the road and adjoining the yard divided the field and yard only by a rail fence, extending west from the house some three hundred and fifty yards. The enclosure south of the road, and immediately in front of the house, known as the orchard, extended west, about two hundred and fifty yards. The house contained two large rooms, eighteen by twenty feet square, with a hall between, and a gallery on the south, fronting the road, ten feet wide. Each room had a door in the south centre, facing the road, and one foot east of each door in each room there was a window fronting the road south."

The witness and his wife on the night of the tenth of July, 1882, slept in the east front room. His two daughters and a little boy slept in a shed room. The wife and infant of the deceased slept in the west room. The deceased went to sleep that night on some quilts spread on the front gallery. He lay with his head near the window of the room in which his wife and infant were sleeping, with his feet extended south. At about two o'clock that night, the witness was aroused by the firing of guns, to which he paid no attention until he heard some of the shot strike a wash pan on the gallery. He then got up and went out on the front gallery, and found his son, the deceased, wounded, and in a delirious condition. The witness could not say positively how many shots were fired, but he thought that he heard some seven or eight. The witness took his son, the deceased, into the room where his wife was, and sent for his neighbors, Messrs. Rainbolt, Hamrie and Williams, and Doctor Fears. The witness's son Henry, who lived some two hundred and fifty yards east, had gone that night to watch with the sick child of a neighbor. His son Joe, who lived a mile west from the witness, was at home on the night of the shooting. The deceased lived some four miles from the residence of the witness, but on account of his wife's recent ill health had been staying at the witness's house some three weeks.

The witness did not go out of the yard that night, and when the neighbors came it was agreed that no one would go out of the yard until morning when observations could be taken. An examination of the premises was made early next morning, and it was discovered that five or six turkey shot had penetrated the

pillow on which the deceased's head lay the night before. Fifty-four shot, varying in size, turkey size and low mould buck shot size predominating, but including four Colt's army size balls, struck the house. One of these large sized balls struck the east window facing of the west room, the range indicating that the person who shot stood at or near the corner of the yard and field fence, some thirty steps southwest from the house. The marks of the shot were scattered from the place on the gallery floor where the deceased was lying to the west corner of the house, and some of them passed into the house through the open door. One shot struck the railing of the bed upon which the deceased's wife was sleeping; one or two passed over and three under the bed and went into the inner wall of the house.

The investigating party, of which the witness was one, found some wadding near the corner of the yard fence from where it was evident the shots had been fired. There were two lots of wadding found; one about the corner where the yard and field fence join, and one at the next corner of the rail fence west. The fence was ten rails high at the corner, but not so high at the point where the other wadding was found. The top rail at the corner was powder burned, and a rifle, or Colt's army sized pistol ball was discovered imbedded in the topmost rail of the first panel of the fence dividing the yard and field.

Three different foot tracks were discovered. Two were barefoot impressions, one about a number five and one a number ten or eleven. The other was the impression of a number eight shoe. The barefoot tracks came from the west, and went from the east, in the road, which was dry and dusty. The shoe tracks only appeared occasionally in the road and near the corner of the orchard fence west of the house, turning out of the road south and going west, after which they were not again seen. The party followed the barefoot tracks some six hundred yards, down the road west to a post oak flat, where they were lost. Here the party turned out of the road, and found, some twenty steps south, where two animals, the signs indicating a horse and a mule, had been hitched. Two or three days later, after it had rained, the witness found, a short distance from the southwest corner of the orchard fence, a place where an animal of some kind had been hitched.

The witness could say that the larger of the barefoot tracks was the track of Sam Rider. He had often seen Rider's track. Rider often went barefoot, and had a large, long, trim, well-

U

shaped foot, the hollow of which was deeper than is ordinary with the feet of men who go barefoot much. He took a measure of this track on the morning after the shooting, and has carefully preserved it since. He saw Rider make a track on a smooth road several days after the shooting, and immediately sent for Rainbolt to come and compare with it the measure of the large track taken on the morning after the shooting.

The witness had lived in that neighborhood, in Nacogdoches county, forty-four years. His son, the deceased, at the time of his death, on the fifteenth day of July, 1882, was about twenty-five years old. The witness had, in his lifetime, exchanged hard words with several persons, but, with the exception of the defendant, he had never had a serious difficulty with any one. The deceased, some five or six years previous to his death, and when quite young, had fisticuff with Jack Humphries, but their disagreement was of short duration, and resulted in friendship and good feeling. The defendant Hogan, James Branch and Joe Rider, were prosecuted about a year previous to this shooting for malicious mischief. About a month later, or about eleven months before this shooting, the witness, the deceased and William Collins overtook the defendant on the road, and the witness struck defendant over the head with a stick. Bad feeling had existed between the witness and the defendant ever since. The prosecution for malicious mischief engendered bad feeling between the witness, and Hogan, Sam and Joe Rider and Branch, and it has existed ever since.

With reference to the discovery of the track of an animal near the southwest corner of the orchard, the witness testified as follows: "It rained on the Tuesday or Wednesday night after the shooting of Abner Craig, which occurred on Monday night. A few days after the rain, I cannot say how many, I found signs in the woods, some little distance southwest of the corner, as of where an animal of some kind had been hitched, or stood. I could not say whether it was the track of a horse or mule, or of what kind of an animal, or how long it had been made, except that it had rained on it since it was made. Sam Rider lives about two and a half miles west from my place, on the Logansport road, and the defendant lives some ten miles west from my place, not on the Logansport and Nacogdoches road, but north of it some six or seven miles."

F. M. Rainbolt testified, for the State, that he lived about one mile distant from William Craig's house. He was sent for, and

reached William Craig's house at about one o'clock on the night of July 10, 1882. He found the deceased lying on a pallet in the west front room, suffering from several recently inflicted gunshot wounds. Several of the neighbors were at the house when the witness arrived, and others reached there later. He did not know whether or not any of them had been out of the house before he got there, but after he arrived it was agreed that no one should go outside until morning, and, so far as the witness knew or believed, no one did go out during that time. In the morning, before it was good light, those present began their examination of the premises. A number of shot were found in the wall of the house, covering a space on the front or south wall of the west front room, extending from its southwest corner to the east facing of the window on the right of the front door of the said room, and extending from the floor to a height of about two and a half feet Shot were also found in the west wall of that room, extending from its southwest corner to a distance of three or four feet north. Shot were also found in the water shelf, which extended across the west end of the front gallery, and one shot had struck the wash pan. One shot was found in the bedstead, inside of the room, and two or three had passed under the bed into the inside wall of the room. Four large balls of the army six shooter size, forty-four or forty-five calibre, were found. One of these had struck the wash pan on the water shelf, two were in the west end of the house, near the southwest corner, and one entered the east facing of the window, to the right of the front door of the west room. Another, making five large balls, was found buried in a rail of the fence between the southwest corner of the house and the outside fence. The balls exhibited were the same taken by the witness from the several places mentioned. The shot found at the places mentioned were of three different sizes, and numbered altogether some forty or fifty. The largest were low mould buck shot, the next in size were turkey or duck shot, and the smallest size, of which only one or two were found, the witness would call large squirrel shot.

It was found, from the direction in which the shot had entered these several places, that they were all fired from a point at or near the southwest corner of the yard, and after good daylight that point was examined. The southwest corner of the yard was about thirty yards from the southwest corner of the house, and was formed by the junction of the fence of the front yard, which

runs from east to a point about three hundred yards west of the house, with the west string of the yard fence. This west string is a crooked six-rail fence, and it runs from north to south to its intersection, at the southwest corner of the yard, with the string of fence running east and west. The front fence is of straight plank to a point within a few panels of the southwest corner of the yard, from which point to the corner, and on thence to the corner of the field, some three hundred yards west, it is a crooked rail fence. The Nacogdoches and Logansport road runs in front of Craig's house, through a lane formed by the front yard fence and a fence enclosing an orchard opposite.

Some wadding from a shot gun was found inside of the yard, and in the corner panel of the fence at the southwest corner of the yard. Another batch of wadding from another shot gun was found in the field, in the panel west of the corner panel. One batch of this wadding was of the light yellow paper used in the manufacture of the paper bags used by grocers. The other batch was partly of the same kind of paper and partly of news-paper. He identified the wadding handed him as that which he picked up at the time and places mentioned, and which he gave to the district clerk. From a word on it, which he did not now re-member, he thought at the time that the newspaper used was a fragment of an issue of the Galveston News. On the top rail of each of these two panels of fence, in range with and in front of each batch of wadding, and in the direction in which the shot entered the house, powder burn was found. The large ball spoken of entered the rail in range of a batch of wadding. The panel of fence at the southwest corner, where the nearest pow-der burn was found, was eleven rails high. The witness, who measured six feet and one inch in height, could just chin it. He experimented with a gun and found that standing on the ground, he could just reach to discharge a gun over it, in the range indi-cated by the shots which had struck the house. This would have been impossible for a shorter man than the witness. Sam Rider was six feet one or two inches high, while neither the defendant nor Charley Fowler was over five feet and eight or nine inches high.

At and near the point where the parties stood who did the shooting, the ground was covered with a sward of carpet grass, and no footprints or marks could be seen, but, examining for tracks leading to or from this place, at a distance of about fifty or seventy-five yards west, they discovered two barefoot tracks

going to and returning from the east. They were in the road, going and returning. These tracks were followed west to a point within twenty-five or thirty yards of the corner of the south or orchard field fence, where a shoe track was discovered. It crossed the road to the south, and turned out at the corner of the fence and disappeared. The fence at this corner projects into the road and is surrounded with carpet grass, so that the witness could tell no more about this track than that where he last saw it it was pointing outwards as though going around the corner.

The witness measured the three tracks. The larger barefoot track was that of a man who would wear a number ten or eleven shoe. The smaller was of a man who could wear a number five. The witness testified before the examining trial that this smaller was the track of a man who would require a number six or seven shoe, but he had since tested his measure and found that the wearer could have worn a number five. Since taking the measure of these three tracks the witness had been shown by Mr. Craig a large barefoot track which had been made in a sandy place, after something had been dragged over it. Of this track the witness took a very careful measure with the same measure stick he used in measuring the large tracks at Craig's on the morning after the killing, and in exactly the same manner, that is, lengthwise, across the heel and across the ball of the foot. The measurement of the barefoot track at Craig's and that of the barefoot track shown the witness by Craig afterwards corresponded in every particular. The witness did not see who made the track in the sand, but Mr. Craig, who stood by and saw him measure it, told him that Sam Rider had just passed along there, and that he saw Rider make the track.

This witness, since he measured the small barefoot track at Craig's on the morning after the killing, had measured the track of Charles Fowler, with the same stick used on the smaller barefoot track at Craig's, and found that the measurements corresponded in every particular. He also measured the shoe track spoken of, and found it to have been made by a number eight boot or shoe, but as it has since been concluded that the shoe track was made by some of Craig's folks, the witness had thrown away the measure stick used on it, and no further attention was paid to that track.

The witness, and the party with him, followed the barefoot tracks down the road westwardly, a distance of some six hun-

dred yards from Craig's house to a drain or glade across the road, where they were lost. They were again found in the flat, where they turned from the road into the woods. Following this direction some fifteen or twenty steps, a place was found where a horse and mule had been tied. The party followed the horse and mule tracks to the road, and found the point where they left the road and returned to it. From here the horse and mule tracks traveled westwardly in the road.

The witness knew Sam Rider well, and had often seen his barefoot track, and declared his belief that Sam Rider made the large barefoot track found at Craig's on the morning after the shooting. He described the peculiarities of Rider's feet exactly as they were described by Craig. There had been no rain for a long time prior to the shooting of the deceased, and the ground was very dry. The witness denied that he said on the examining trial that the ground was so dry and sandy at the time that it was impossible to get a correct measure of tracks. He said that, for the reason mentioned, a correct measure was difficult to obtain.

The witness had lived a neighbor to Mr. William Craig for thirty-seven years, and in that time had never known Craig to have a serious difficulty with any of his neighbors. He knew of Craig's having no enemies unless they were this defendant, Fowler, Sam and Joe Rider and another, who were implicated and prosecuted for practicing malicious mischief upon Craig and Collins. The witness exhibited one of the large balls taken from the wall of Craig's house, and said that it was of the same weight as a new ball given him by some one. The ball taken from the wall was battered somewhat. He tested these two balls together in a pair of druggist's scales by putting one in each cup. The new ball was a fraction the heavier, bearing the scales down a little, but not the full distance. This new ball, he testified, exactly filled the dragoon Remington pistol now in court, which was the same pistol which was repaired by Eddings, and taken from the defendant.

William Collins, the brother-in-law of William Craig, and the uncle of the deceased, and father-in-law of the witness William Haney, testified that he had known William Craig for thirty years, and that Craig had no enemies that he knew of, except the defendant and Sam Rider. The witness, the deceased and another son of William Craig were present on one occasion when William Craig struck the defendant over the head with a stick.

The defendant, Sam and Joe Rider and James Branch were prosecuted about October, 1880, for malicious mischief about the place of the witness.

This witness testified that he met Charles Fowler, at about sunset, on the evening of July 10, 1882, in an old Indian field on the Nacogdoches and Logansport road. He was traveling almost in the direction of the defendant's house, which was distant some six or seven miles. He was remarkably poorly dressed, wearing old, torn, much soiled clothes, and an old, torn, worn, battered, flapped hat. At that time he had on a pair of boots, and was traveling very slowly. After he passed the witness, he looked back three different times. Fowler was then riding a brown mule.

W. Halton testified, for the State, that he was a printer by profession, and was somewhat acquainted with the type and make-up of the Galveston News. The type of that paper differs somewhat from the type of country papers, such as the Nacogdoches News, the San Augustine Saxon and Henderson Times, in that it is smaller. The principal part of the type of the Galveston News is nonpareil. The St. Louis Globe-Democrat, the Houston Post, the Austin Statesman, the Christian Advocate, and a great many other papers use just such type as is used on the Galveston News, but not more than that of other papers mentioned by the witness as using nonpareil type.

William Phillips, for the State, and also for the defendant, testified that on Monday, July 10, 1882, the defendant came to his house soon after dinner to exchange his rifle for the witness's double-barreled shot gun, saying that he desired the exchange for that evening, because he was going to make a drive with Mr. Boyt, Allen Bagget, P. G. Nooner, and one or two others. The witness loaned him the gun, and told him that one barrel was loaded with buck shot, and the other with small shot. The witness went with the defendant after giving him the gun to a sand bar, about a quarter of a mile from the defendant's, where the defendant said he was to wait for Boyt, Bagget and Nooner. The witness left him hitching his mule. When the witness loaned the gun to the defendant one barrel was loaded with number one or large sized buck shot, of which the gun chambered three so tightly that they could not be drawn without striking the gun barrel against something. The other barrel was loaded with mixed shot, some being duck or turkey shot and some squirrel shot. The wadding in the gun was fragments

from the Galveston News. The witness also lent defendant his shot pouch but did not examine to see what was in it. The witness had used the pouch for about four years, and, a few days before he loaned the gun, had put a piece of the Galveston News in it, and it was still there when the defendant got it. The witness had used some dark brown wrapping paper some weeks before, but not such brown paper as was here shown him. He did not know whether the pouch when he loaned it to the defendant had in it any of the brown paper of the kind he used or not. He did not think the pouch then contained any caps or powder, and knew that it contained no buck shot, except perhaps two or three large ones like those with which one barrel of the gun was then loaded.

The witness loaned this gun to the defendant on Monday evening, July 10, 1882, and told him that if he, the witness, needed it within the next several days, and before it was returned, he would call for it. On the Friday following the Monday night of the shooting of the deceased, the witness, in company with Cleve McNeal, went to the defendant's house to get the gun. William Randle was at the house. When the defendant brought the gun out, the witness asked him how it was loaded. He replied: "Just as when I got it." He said that Randle saw him make a good shot with the right hand barrel, that he killed a squirrel a long way off. The witness asked him to draw out the buck shot and replace it with squirrel shot. In the presence of the witness, Cleve McNeal and William Randle, he drew out the wad, and said: "Bill, why in the h—ll do you put so much paper in your gun?" The wad he drew out looked like newspaper, and did not look unlike that which the witness had put in the gun. The buck shot would not follow the wad out, and the witness told the defendant to strike the muzzle on the floor, which he did, and, the witness supposed, dislodged the buck shot, but witness did not see them, nor what was done with them. Defendant then poured in a load of squirrel shot. The witness tested them after he got home, and knew that both barrels were then loaded with squirrel shot.

When the shot pouch was returned to the witness it contained newspaper similar to that which it contained when the defendant got it, and a small piece of dark brown paper, which may or may not have been in it when it was loaned. The shot and the wadding found at the scene of the shooting at Craig's was here exhibited to the witness, and he testified :

"The buckshot are not so large as those with which my gun was loaded when borrowed by the defendant. I call these low mould buckshot. Those in my gun were much larger. The small shot presented to me are battered and flattened so much I can't say with any certainty whether they are of the same size, but if they were round, they look like they would be very near or quite the same size as the larger size in my mixed load. Squirrel shot are of three sizes, and this one seems to be of the largest size, and I don't think that the squirrel shot in my gun were of that size. The wadding shown me is newspaper, and that in my gun was newspaper. That in my gun was torn from the Galveston News. I don't know whether this is or not. This light yellow paper was not in my gun when I lent it to the defendant. I don't remember ever to have used paper like this for wadding, and this is not like the brown paper found in my pouch after the defendant returned it. The brown paper which I sometimes used, and that which was in my pouch when it was returned, was darker, heavier and coarser than this. The paper I speak of was like that kept by merchants in large sheets for wrapping goods, while this is like the paper of which small sacks are made, and used in stores for small parcels."

To the above testimony of this witness, the trial judge made an addenda as follows: "On his examination by the State, he (the witness Phillips) stated that 'when he got the gun from Hogan (the defendant), on Friday, it was loaded with squirrel shot. I know this for I fired off the barrel he had loaded at an object, and know from the size of the holes made by the shot; and the other barrel I saw him load with squirrel shot. This barrel I also attempted to fire, and bursted one cap on it and it failed to fire, and I did not try to fire it any more. But as I wanted to wash out the gun, I unbreached it, and poured water in it, and soaked out the wads. The wads were in such a bad condition I could not tell anything about them.' He also stated that he found in the shot pouch, after Hogan returned it to him, three or four buck shot of the size with which the gun was loaded by the witness when Hogan borrowed it, and also some buck shot of a size smaller, but larger than the shot now shown him as the one taken out of the house of Craig. This shot shown him he takes to be 'low mould buck shot,' and some of the buck shot in the pouch were a size between this shot shown him and the size with which the gun was loaded when he borrowed it from Hogan (?) Then when the witness was placed upon the

stand by the defendant, he states that he was not certain that there were only three or four of the large shot in the pouch, when defendant returned it, but on reflection thinks there were six or seven of said large shot (of the size with which the gun was loaded at the time Hogan borrowed it) in the pouch."

Jackson Parrot testified, for the State, that he and the defendant had always been on intimate and friendly terms. The witness saw and had a conversation with the defendant at a term of the justice's court in January or February of 1882. The witness and the defendant were sitting on a log, and the witness thought that Sam Rider was present. There were others around and passing to and fro. William Craig was at court. The defendant then and there told the witness that Craig had given him a sore head, and that he intended to have revenge; that every dog had his day; that as long as Craig and Collins had gone to "logging it," he would "log it" too; that the sun did not always shine, and that he would have revenge; that if he could not get it at one time, he would get it at another, when it was convenient. The defendant said on this occasion that Craig had hit him with a stick, and that he considered that Craig had waylaid him, and he also said something about taking Craig to Tyler. This conversation occurred on the Tuesday two days after the collision between William Craig and the defendant. The witness had understood that the defendant, Joe Rider and Jim Branch were enemies to William Craig and William Collins.

William Haney testified, for the State, as follows: "I know the defendant, William Hogan. I saw him at Boggy church on the Sunday following the Sunday on which it was said that he and William Craig had a difficulty at the church. Hogan and I had a conversation. No one else was present. He said: 'Craig and I have had a difficulty. He struck me on the head with a stick. My mother is in precarious health, and as soon as she dies or gets well, the jig is up between me and Mr. Craig.' I was not very friendly with Hogan at the time. Previous to that time Hogan and I were talking of swapping shoes. I tried on his shoes, and they fit me very well. He tried on my shoes, and they seemed to fit. We each had on number eight shoes at that time."

Sam Sapp, deputy sheriff of Shelby county, testified, for the State, that late on the sixteenth day of July, 1882, with several other men as a *posse*, and with a warrant, he went to the defendant's house to arrest him. He distributed his men about the

premises, and asked for William Hogan. The defendant's wife said that he was at home. The witness then told her that his name was Sapp, and that he was an officer, and demanded that she open the door. The defendant got up, took up his pistol, and said: "No man is to come in." The witness told him that he was an officer. The defendant asked: "Is it all right?" The witness replied that it was. The defendant then asked Lee Jophlin if it was all right, and Lee answered "Yes." Hogan then said, "Come in," and laid his pistol on the mantel shelf. The dragoon or army Remington pistol in court is that pistol. Sam Rider came up to Hogan's gate with his gun, and inquired for the sheriff, saying that he knew he was there, and that he, Rider, wanted to surrender.

Andy Eddings testified, for the State, that he was a gunsmith by trade, and that his shop was about three miles west from William Craig's, about four hundred yards from Collins's, a half mile from Sam Rider's, and about eight miles from the defendant's. About one or two o'clock on the tenth day of July, 1882, Charles Fowler came to the witness's shop with four pistols, which he wanted repaired. He had with him, too, a double-barreled shot gun, which, having caps on it, the witness supposed was loaded. The pistols were all loaded. One of the pistols was a dragoon or army Remington six shooter, a smaller one was navy size, another one was a Colt's five shooter, and the fourth was a Smith & Wesson's six or seven shooter of twenty-two calibre. Fowler wanted the work done immediately, and the witness commenced and finished in one or two hours. The sun was two hours high when the witness finished, but Fowler lay down on some lumber until at or near sundown, when he got up and rode off at a gallop. He went east, in the direction of Collins's, Sam Rider's and Craig's houses. At Collins's place, however, he would reach the Nacogdoches and Logansport road, which, if he traveled west, would take him to the defendant's house, where he lived. He rode one of Hogan's mules, and wore very dirty, shabby clothes and a dilapidated hat. The large Remington six shooter now shown the witness is the same which he repaired on that evening. When directing the witness about the repairs of this pistol, Fowler said: "I want that fixed all right."

Jack Humphries, who resided on the Nacogdoches and Logansport road, some two hundred and fifty yards east of Sam Rider's, and about two and a half miles from Craig's, testified, for the State, that on the night of the tenth of July, 1882, about

eleven o'clock, he heard the noise of horses' feet passing down the road towards William Craig's house. He heard the same noise of horses' feet passing west at about two o'clock on the same night. He could not tell how many there were, nor whether they were horses or mules. He could see nothing in the direction of these noises, nor did he try to see if he could tell how far they went. The witness had a difficulty with the Craig boys some six or seven years ago, but they made friends, and are friendly to this day.

Allen Bagget, for the defense, testified that he lived within four miles of the defendant. The witness went to Jeff Boyt's to go hunting one evening, and while they were arranging their hunt the defendant rode up on a mule and asked if the witness and Boyt were going to drive that night, and they replied that they were. The defendant then said that he would go and get Phillips's gun and go too. The witness answered, "All right,' and they agreed to meet at a sand bar behind Hogan's field. The defendant rode off. On account of the heat, the witness and Boyt did not meet their engagement, but took another and a shorter drive. The witness did not state when this occurred.

P. G. Nooner testified that he was at Boyt's, arranging with Boyt and Bagget to go hunting, when the defendant rode up with his rifle, and proposed to go and exchange his rifle with Phillips for his shot gun and accompany the party. The balance of the testimony of this witness was the same as that of Bagget, except that he fixed the time as at one o'clock on the tenth day of July, 1882. They did not meet their engagement with the defendant, because it was so dry and hot the dogs would not hunt.

Doctor Barnett, the defendant's family physician, testified, for the defense, that he borrowed for, and carried to, the defendant a pair of number six box-toed shoes, which the defendant wanted to wear a while, because of a sore toe. The witness did not directly locate the date of this transaction, but, from other and immaterial parts of his testimony, it may be inferred that this occurred on the third day of July, 1882.

Cleve McNeal testified, for the defense, that he was present at Hogan's house on the Friday after the shooting, when Phillips came after his gun. He saw Hogan twist the wad out of the gun. The wad was of newspaper, and was a large one. Hogan then turned the gun and knocked it on the floor, and the witness saw the buck shot roll out on the floor, and saw Hogan pick them up and put them in the pouch. The buck shot drawn from the

gun were a shade larger than the new shot shown to the witness on the stand, and much larger than the shot called "low mould" buck shot, found in Craig's house.

William Crawford and Bud Davidson testified that they knew the reputation of William Haney for truth and veracity. It was bad, and they declared that they would not believe him on oath. Both of these witnesses admitted that they were enemies to William Haney and his father.

G. W. Carnes testified that he was present at the justice's court on the occasion spoken of by the witness Jackson Parrot. Old man Craig was being prosecuted for assault on the defendant. The witness heard what Hogan had to say there at that time. Hogan said that old man Craig had treated him very badly, that he had beaten him over the head with a stick; that he could not get justice in Nacogdoches county and intended to prosecute Craig in the Federal Court to get justice, and that every dog had his day.

E. Stiner, a practical boot and shoe maker of fifty years experience, testified, for the defense, that he had just measured the defendant's foot, and that his proper number for foot wear was six and one-fourth or six and one-half by shoemakers' standard measurement. The boot which the defendant was wearing on this trial was a number six.

Rosetta Cunningham, a sister of the defendant, testified that she lived in the same lot with the defendant and in a house some eight or ten steps from his, and had lived there for two years. Her half sisters, Lucinda and Georgia Ann Cathey, lived with her. Charley Fowler lived with the defendant. The witness saw the defendant at his house, at sundown, at dark and at about nine o'clock on the night of the shooting of Abner Craig. She saw him again early on the next morning, washing his face on the gallery. The witness's half sister, Georgia Ann, stayed over that night in the defendant's house to wait on the defendant's wife, who was sick. The defendant hoed his cotton until noon on the tenth day of July, 1882, and rode off somewhere for a short time in the afternoon, but returned before sundown. His conduct on that night was as usual. Charley Fowler left the defendant's house after twelve o'clock on that day and did not return up to nine o'clock that night, when the defendant went to bed. The witness saw Fowler next morning just before breakfast.

Miss Lucinda Cathey testified, for the defense, exactly as Mrs. Cunningham testified.

Miss Georgia Ann Cathey, the defendant's half sister, testified, for the defense, that she remained in the defendant's house the whole of the night on which the deceased was shot, to wait on his wife, who was sick. At about nine o'clock the defendant lay down on a pallet near his wife's bed, and a little later the witness lay down on the same bed with the defendant's wife. She got up at eleven o'clock and at one o'clock that night, to administer medicine to the sick woman, and the defendant was lying on his pallet, both times. The defendant did not, to the knowledge of the witness, leave the house that night. He got up from his pallet about daylight next morning. Charley Fowler left the defendant's house shortly after dinner on Monday, and the witness saw nothing more of him until about daylight next morning, when she saw him lying on his pallet on the gallery. There was a small discrepancy between the testimony of this witness and that of Miss Lucinda Cathey. The latter testified that she saw the defendant's wife getting breakfast on the Tuesday morning after the shooting. This witness testified that she herself cooked breakfast on that morning, and that she had no assistance from the defendant's wife.

Doctor John Fears, William Weatherby, F. M. Rainbolt and John Little, in rebuttal, testified, for the State, that they were well acquainted with the general reputation of William Haney, for truth and veracity, and that it is good.

It was proved by the State that Mrs. Sam Rider and the defendant's wife were sisters and visited each other, but that unfriendly feelings had existed between Sam Rider and the defendant ever since the defendant's marriage in April, 1882.

The motion for new trial, which was overruled, was addressed to the instructions of the court, and to its rulings on the evidence admitted and rejected.

The motion in arrest of judgment set up that no judgment has been legally rendered against the defendant, and that it did not appear from the face of the indictment that the defendant was guilty of any offense. Motion overruled, and appeal prosecuted.

*J. J. Perkins* and *F. Lawson,* for the appellant.

*H. Chilton,* Assistant Attorney General, for the State.

Opinion of the court.

WHITE, P. J. A careful and mature consideration of the evidence, as we find the same disclosed by the record in this case, has wholly failed to satisfy us of its sufficiency to support and sustain the verdict and judgment rendered. That a murder—a most cold blooded assassination—of the deceased, Abner Craig, was committed at the time alleged in the indictment cannot for a single moment be doubted. That Hogan may have had a motive to kill, and may a month before have indulged in threats against the father of the deceased, may also be true. But further than this, the only other inculpatory facts proved are his having in his possession previous to the killing a gun, and subsequent to the killing a pistol, with which weapons it is concluded, from the character of the wounds inflicted and the balls and shot found and picked up at the place of the shooting, that the homicide was committed.

There is no evidence, positive or circumstantial, which tends directly to connect appellant with the deed. It is most conclusively shown that other parties were there at the time of its commission, and it may possibly be true that appellant was also present and an active participant with them in the crime. If so, however, his complicity should be shown by better and more satisfactory evidence than strong probabilities or strong possibilities and suspicions of guilt. As presented to us, we cannot consent to permit this conviction to stand and become a precedent. It may be that upon another trial the State will be able to adduce other and more conclusive evidences of guilt. The judgment is reversed and the cause remanded.

*Reversed and remanded.*

Opinion delivered November 24, 1882.