# FEBRUARY, 1913.

### SAM LUCAS v. STATE.

No. 2183.  Decided February 5, 1913.

Rehearing denied April 16, 1913.

**1.—Murder—Continuance—Want of Diligence.**

Where the court overruled the application for continuance which clearly showed a lack of diligence, there was no error.

**2.—Same—Indictment—Precedent.**

Where, upon trial of murder, the indictment followed approved precedent, there was no error in overruling a motion to quash.

**3.—Same—Sufficiency of the Evidence—Pleading—Proof.**

Where, upon trial of murder, the evidence supported the conviction of that count in the indictment which charged the defendant with killing deceased by beating and bruising her with a weapon the name, character and description of which was to the grand jury unknown, there was no error on this ground.

**4.—Same—Charge of Court—Voluntary Use of Intoxicating Liquors.**

Upon trial of murder, where there was no evidence that defendant claimed that he was insane from the recent voluntary use of intoxicating liquors, there was no error in the court's failure to charge upon art. 41, Penal Code; besides, the complaint in the motion for new trial on this ground was entirely too general, and no special charge having been requested and no bill of exceptions reserved at the proper time.  Following Byrd v. State, 151 S. W. Rep., 1068; Ex parte Evers, 29 Texas Crim. App., 539, and other cases.

**5.—Same—Use of Intoxicating Liquors—Intoxication no Defense.**

The mere fact of intoxication at the time of the homicide will not affect the crime nor the degree of murder.  Following Clore v. State, 26 Texas Crim. App., 624, and other cases.

**6.—Same—Misconduct of Jury—Statement of Facts.**

Where the statement of facts, on the motion for new trial attacking the verdict of the jury for misconduct of the jury, was filed after the adjournment of the trial court, the same could not be considered on appeal; besides, the record showed that there was no such misconduct.  Following Knight v. State, 64 Texas Crim. Rep., 541, 144 S. W. Rep., 967 and other cases.

**7.—Same—Corpus Delicti—Sufficiency of the Evidence.**

Where, upon trial of murder, the evidence showed that the deceased was killed by violence to her person and that the defendant and no other killed her, the corpus delicti was established and the conviction of murder in the second degree sustained.

Appeal from the District Court of Tarrant.  Tried below before the Hon. James W. Swayne.

Appeal from a conviction of murder in the second degree; penalty, thirty-five years imprisonment in the penitentiary.

The opinion states the case.

*Lattimore, Cummings, Doyle, Bouldin & Splawn,* and *B. D. Shropshire,* for appellant.—On question of court's failure to submit Article 41, Penal Code, with reference to the use of intoxicating liquors: Edwards v. State, 54 S. W. Rep., 589; Navarro v. State, 43 S. W. Rep., 105; Lawrence v. State, 65 Tex. Crim. Rep., 93, 143 S. W. Rep., 636; Phillips v. State, 50 Tex. Crim. Rep., 481, 98 S. W. Rep., 868; Hierholzer v. State, 83 S. W. Rep., 836.

On question of misconduct of jury: Wilson v. State, 39 Texas Crim. Rep., 365.

On question of failure to prove corpus delicti; Conde v. State, 35 Texas Crim. Rep., 98; Lucas v. State, 19 Texas Crim. App., 79; Harris v. State, 28 id, 308; Gay v. State, 49 S. W. Rep., 612; Hunter v. State, 31 S. W. Rep., 674.

*C. E. Lane,* Assistant Attorney-General, and *John W. Baskin,* county attorney, for the State.—Cited cases in opinion.

PRENDERGAST, JUDGE.—On December 22, 1911 appellant was indicted by the grand jury of Tarrant County for the murder of Maude Tatum on December 4, 1911. He was convicted of murder in the second degree and his penalty fixed at thirty-five years confinement in the penitentiary.

There were five counts in the indictment; the court submitted but three of them. One of these charged, besides the other necessary averments, that he murdered Maude Tatum by striking, wounding and bruising her with his fists, from the effects of which she instantly died; another, that he murdered her by beating, wounding and bruising her with a weapon, that he murdered her by beating, wounding and bruising her with a weapon, the name, character and description of which is unknown to the grand jury, from the effects of which she instantly died; the other, that he murdered her by choking and strangling her, from the effects of which she instantly died.

The record is somewhat voluminous, but it will be necessary to give only a brief summary of the evidence in order to discuss and decide the questions raised.

Deceased, Maude Tatum, was a prostitute. Appellant was a married man. They both lived in Fort Worth. Appellant, at the time of the death of the woman, and for some time prior thereto, had "kept" her. She had a room over a saloon, and appellant frequently stayed there at night with her. The saloon-keeper, Harry Hamilton, and his wife also occupied a room over the same saloon. They knew of the relations between appellant and deceased, and knew that he kept her there. Soon after noon on December 4, 1911, these four persons went to the country in a two-seated hack, carrying with them a considerable quantity of beer and whisky. They were all apparently friendly during the evening. They drank the beer and whisky during the evening, and returned to Fort Worth just about or be-

fore night and went to two or three different saloons where they drank more or less before returning to their rooms. The two women perhaps drank more than the men. Anyway, they all got more or less drunk. The two men took the women in the hack to the saloon where their rooms were, the women getting out and going up to their rooms, the men taking the hack to the stable, and then returning to this saloon over which the women were. Both of them took several drinks before returning. The two men got back to Hamilton's saloon where the women were about 8 o'clock or before. Appellant went up into the deceased's room, the other woman having gone to hers. Very soon afterwards Hamilton, who remained downstairs in his saloon, heard appellant slapping or beating the deceased up in her room. He went up there and interfered. Appellant was slapping her in the face with his hands, using considerable force. Hamilton interfered and got him to stop beating the woman at that time. When Hamilton went up and interfered with appellant when he was slapping the woman, appellant said to him that she was his woman and he could whip her if he wanted to. When Hamilton interfered and started to pull appellant out of the room at this time, appellant said something about slapping him, too. Hamilton then left and went back into his saloon. About 11 o'clock the woman came down from the room and went out in town somewhere. Appellant remained there, it seems, in bed. The evidence shows that appellant was then drunk, but does not show that he drank any more after getting to deceased's room about 8 o'clock. The woman returned to Hamilton's saloon from out of town somewhere about 12 o'clock and went up to her room. Appellant was up there in her bed. About 2 o'clock Hamilton found her at the foot of the stairs too drunk to go up. He called help and took her up to her room and laid her on her bed. Appellant then got up and sat on the edge of the bed. Appellant then commenced to beat her again in the face, slapping her in the face, while she was on the bed flat on her back too drunk to do anything. Hamilton, the witness, again interfered and tried to stop him, and finally did get him to stop. During this time appellant took the water pitcher off the washstand and threw it at her head, but because of the interference of the witness and warding off the lick he missed her. She was then so drunk she could not get out of bed, and was in an unconscious condition. When Hamilton, the witness, and another, who was then with him, undertook to prevent appellant from beating up the woman again, he said, "I will kill that blonde-headed whore if I want to"; that she was his woman, and he could kill her if he wanted to. Finally Hamilton stopped him and he agreed to behave himself and to go to bed. The witness Hamilton, it seems, did not go upstairs to go to bed with his wife until about 2 o'clock that night. In order to do so he had to pass Maude Tatum's door, and he then saw her and appellant in her room. Later he saw appellant go out of the woman's room; cover her up, put out the lights and shut

the door. In covering the woman up with the bed covers he spread it up over her head. Hamilton asked him where he was going, and he said he was not going to sleep with that blond-headed bitch that night, that she was drunk, and he was going home, and he went downstairs and left. It seems that no one saw the woman any more from 2 o'clock after appellant went out of her room, as just stated, until about 8 o'clock the next morning. There is no evidence or intimation whatever that anyone else other than appellant was in her room at all that night other than the witness Hamilton and the party who went with him up there at the time they last took her up the steps, and that they only stayed there a short time after appellant began to beat her up and threw the pitcher at her until they left the room. The next morning Hamilton and his wife found the woman dead. Blood was all over the pillow; it was saturated with it, and the blood had run into and entirely through the mattress. Her face was black and blue; she was lying with her face down, and a large pool of blood was about her face. There were marks on both sides of her throat; there was a bruise across the forehead and her lips, and black marks around her throat and around her neck, and both eyes were black, and marks on both sides of her throat. The body of the dead woman was removed to an undertaker's. She was washed, dressed and her body embalmed. One of the doctors who saw her there testified that her whole face looked like it had been pounded. Another one of the witnesses who described her condition soon after she was found dead said her face was bruised, lips swollen and eyes swollen; in fact, her entire face was swollen very badly; there were bruises on her neck and her breast around her. The end of the pillow slip was saturated in blood and the bed had spots of blood all in it.

Appellant complains that the court erred in overruling his motion for continuance. His bill on this subject is very meager. Taking the motion, the bill and the record, it clearly shows such a lack of diligence on his part to procure the attendance of the claimed absent witnesses, that the court did not err in overruling it.

Each count of the indictment submitted was amply sufficient, and the court did not err in overruling appellant's motion to quash it.

The court did not err in submitting that count in the indictment charging that appellant killed deceased by beating and bruising her with a weapon, the name, character and description of which was to the grand jury unknown, on the claimed ground that there was no evidence to justify the submitting of any such question. The condition of the deceased when she was found dead the next morning, and the fact that appellant, the last time he was seen to have assaulted her, threw a water pitcher at her, and the other facts and circumstances of the case, did authorize the court to submit this count in the indictment to the jury, and the court did not err in so doing.

Another contention of appellant by his motion for new trial is in this language: "Third: Because the court committed fundamental

error in failing to charge Article 41 of the Penal Code, in regard to intoxication of the defendant, as the evidence clearly raised this issue and the court should have given this law in charge to the jury." This is the entire complaint in the motion for new trial. Appellant requested no charge on the subject. After the adjournment of the court there appears in the record a bill of exceptions to the refusal of the court to charge this article 41 of the Code, but it is just about as general as this ground of the motion for new trial is. No such bill appears to have been taken at the time of the trial, and no bill was at any time taken; merely this bill was taken and allowed after the adjournment of the court. This is entirely too general to be considered by this court. Byrd v. State, 151 S. W. Rep., 1068, and cases there cited.

But if we should consider this the record does not show that appellant claimed that he was insane from the recent voluntary use of intoxicating liquors at all; the evidence does not raise the question at all; it shows that appellant was at himself all the time, knew what he was doing, and did beat up this woman repeatedly during the night, and in no way indicated or claimed that he was then insane from the recent use of intoxicating liquors or from any other cause. The sole fact that he was drunk did not raise the question and did not require the court to charge on the subject. In the case of Ex parte Evers, 29 Texas Crim. App., 539, soon after the enactment of this statute, this court, in a well considered opinion, construed said statute, and, after reviewing the occasion for the enactment thereof and the purpose thereof, said:

"A casual glance at the said statute manifests the intention of the Legislature to be that intoxication shall not 'mitigate either the degree or the penalty of crime.' It is also to be seen that in cases of murder 'evidence of temporary insanity produced by such use of ardent spirits may be introduced by the defendant for the purpose of determining the degree of murder of which the defendant may be found guilty.'

"Viewing the statute in the light of the previous decisions, the language employed therein, and the evident intention of the legislative mind to be gathered therefrom, we are of the opinion that the only construction that can be placed thereon is that since the passage of that law evidence of drunkenness alone will not be admitted for the purpose of mitigating murder from the first to the second degree. It is manifest from the statute that in cases of murder the party accused stands before the law to be tried without reference to his mental or physical condition with reference to drunkenness if the intoxication be caused by the 'voluntary recent use of ardent spirits,' and such intoxication does not reach the stage of temporary insanity. This is not a novel question in this court. This same question came up for decision in Clore's case, in which this court said: 'We think it clear that the legislative intention was, first, that mere intoxication from recent use of ardent spirits should not of itself in any case excuse

crime; second, that mere intoxication should neither mitigate the degree nor the penalty of crime; third, temporary insanity produced by such use of ardent spirits is evidence which may be used in all cases in the mitigation of the penalty and also in murder, for the further purpose of determining the degree. Of itself intoxication is neither a justification, mitigation nor excuse of any sort of crime. It ' must go to the extent of producing temporary insanity before it will be allowed to mitigate the penalty, and in murder, before it can be considered in determining the degree. This is our understanding of the proper construction to be placed upon the language of the statute.' Clore v. The State, 26 Texas Crim. App., 624.

"It will be observed that the statute has no reference to drunkenness other than voluntary, nor does it refer to insanity other than temporary, and such only as is produced from such use of 'ardent spirits.' The construction herein placed on this statute is believed to be in strict accord with the legislative will and intention, and the only construction that can be legitimately placed thereon. It is a fundamental principle that in the construction of a statute the legislative intent, if that intent can be ascertained, must govern. The design of all rules of construction of statutes is to furnish guides to assist in arriving at the intention of the Legislature. Willson's Crim. Stats., sec. 17; Whitten v. The State, ante, 504.

"The statute before us hardly needs construction. Its language is plain and its purpose easy of access, and lies on the surface of the terms employed. The mere fact of intoxication at the time of a homicide will not affect the crime nor the degree of murder in this State as the law now stands. Clore v. The State, 26 Texas Crim. App., 624; Willson's Crim. Stats., sec. 92."

This construction of this statute has at all times been adhered to by this court. There is no need to cite the other cases, though there are many to the same effect.

The court at which this trial occurred convened on January 1, 1912, and adjourned for that term on March 31, 1912. On March 30th the court heard and overruled appellant's motion for new trial. The order shows that the court heard evidence on the motion before acting on and overruling it. There appears in the record a bill of exceptions filed on May 14, 1912, some month and a half after the adjournment of court. In this bill is attempted to be given what was the testimony on hearing appellant's motion for new trial, in which it is claimed that there was some misconduct of the jury. The court stated in this bill, in allowing it, that after hearing the testimony he came to the conclusion that the verdict was not reached by lot, and that the fact of the defendant not testifying was not discussed in the jury room by the jury prior to the verdict. It is the uniform holding of this court that the statement of facts, whether by bill or statement of facts otherwise, based on grounds in the motion for new trial attacking the verdict for misconduct of the jury, must be filed during term time in

order to authorize this court to consider it. This not having been done in this case, we could not be required to pass upon this question, but even if we did, the bill as qualified by the court would show no error. Knight v. State, 144 S. W. Rep., 980, and cases there cited.

Appellant contends that the evidence does not establish the corpus delicti. We think it fully does so. The condition of the body of the deceased when found dead the next morning after appellant left it at 2 o'clock the night before, with all the surrounding facts and circumstances, shows that the deceased was killed by violence to her person, and that appellant and no other killed her. There is no indication from the evidence, to our minds, that she committed suicide or attempted to commit suicide. The court fairly and substantially submitted this question to the jury, and they found against appellant on it. The evidence satisfies us and fully authorized the jury to believe and find as it did, that the assaults committed upon this woman by the appellant produced her death. No other theory has any support in the testimony.

No other question is raised requiring any discussion by us. We have carefully considered all of appellant's complaints and the able brief of appellant, but find no reversible error.

The judgment is affirmed.

*Affirmed.*

[Rehearing denied April 16, 1913.—Reporter.]