## Evie Smith v. The State.

No. 20483. Delivered November 1, 1939.

The opinion states the case.

*Banks, Nichols & Prothro* and *Willis Synder,* all of Marshall, for appellant.

*Lloyd W. Davidson,* State's Attorney, of Austin, for the State.

CHRISTIAN, Judge.

The offense is murder by abortion; the punishment, confinement in the penitentiary for two years.

Appellant was a midwife and a licensed nurse. According to the testimony of Clarence Patterson, a son of the deceased, Gorie Davis, the home of appellant was about a quarter of a mile from that of the deceased. The witness Clarence Patter-

son was 12 years of age and was in the sixth grade. According to the testimony of Melvia Patterson, a witness for the State, and a daughter of the deceased, it was a mile from deceased's home to that of the appellant. The witness was 11 years old and was in the low fifth grade. There appears to be no other testimony in the record as to the distance between the homes of the deceased and the appellant. Clarence Patterson testified that he and Melvia Patterson walked with deceased from their home to the home of appellant on the night of the 9th of December, 1938; that after they entered the house appellant required that he and his sister leave; that he went around to the front porch, made a hole in the screen, and looked through; that deceased was on the floor on her face and appellant was rubbing her back; that he observed a bottle, a teakettle and a wash pan near deceased; that he later knocked on the door and asked appellant as to the whereabouts of deceased; that appellant replied that she was in the house but would be out in a few minutes; that he waited quite a while and again asked appellant about deceased, and appellant replied that she had gone home; that when he reached home his grandmother told him that deceased had not returned to her home; that about midnight Miss Della Wood came to his home and told his grandmother that deceased was very ill; that he saw the body of deceased that night in the Milton Williams Undertaking Parlor in the City of Marshall; that deceased appeared to be in good health and had not been complaining on the occasion of her visit to the home of appellant.

The testimony of Melvia Patterson was substantially the same as that of her brother, except as to the distance between the homes of deceased and the appellant, and except that she testified to the effect that after appellant had rubbed deceased's back she saw deceased sit on a chamber or bucket.

J. H. Wilson, sheriff of Harrison County, testified that he was called to the home of appellant on the night in question and that he viewed the body of deceased, which was on a bed in the south room of appellant's home. Appellant told the sheriff that she had never seen deceased before. Referring to the visit of deceased to appellant's home, the sheriff testified: "She (appellant) said she (deceased) came to the door and knocked and wanted in, and said she was sick and had a burning in her chest and she told her to come in, and she lifted her on the bed. * * * Elvie said Gorie came there by herself. She said Gorie had been there thirty or forty minutes before she died." The sheriff testified further that he watched

a physician perform an autopsy on the body of deceased at the undertaking establishment. He said: "Well, they cut her open and laid it back and taken the womb out and later taken a baby out." As to the condition of the room in which he found the body of deceased on his visit to the home of appellant, the witness said: "I found a bottle on the floor. It was a five or six ounce bottle. I smelled of it and it smelt like alcohol rub. There was maybe a teaspoonful of fluid in it. Behind the bed, close to the wall, I guess twenty-four inches from the wall, was a slop jar back there—I ran into it before I knew it while examining the body. The slop jar was not empty. I found some white mucous-looking stuff in the slop jar. I don't know what it was. I did detect an odor. It was ether."

It appears from the testimony of the undertaker that he embalmed the body of deceased prior to the time that the autopsy was performed. On his direct-examination he said: "In embalming the body, first, I made an incision in the right arm above the elbow and I found the vein and artery used in the embalming and I injected the embalming fluid through that. After doing that through the arteries, I took a needle, called a trocar, a long needle about fifteen inches long and I put that into the cavities of the body to draw out all fluids, any liquids or blood or anything of that type, and I took that needle and I pushed it all around the inner cavities of the body throughout, up towards the chest and then turned down towards the stomach and the intestines and all down there, the bladder and all; in fact everything in the lower part of the body. I did that until I thought I had touched everything sufficient to preserve the body. I just made one entrance with the trocar and that was about two inches to the right of the navel and about two inches up. * * * That is the only puncture I made on that woman's body." The witness was asked a question by the district attorney as follows: "In your process of embalming you never go through the abdominal cavity?" He answered: "I don't make any openings there. The only thing I did, I took the trocar and I pushed it upwards first. That was from this puncture I testified about. I never inserted or made a puncture anywhere else with relation to that body. I didn't make any puncture in the pelvic region. I did not insert any trocar or any other instrument other than this one puncture up here." On cross-examination, the witness was asked this question: "I will ask you in the course of that embalming whether or not the instrument you used would puncture the uterus?" He answered: "It would puncture it. I couldn't say definitely whether it did in her particular case. I will say

this: I try to puncture all internal organs. I can't say whether I did or not." Further, the witness testified, in effect, on cross-examination, that no autopsy had been performed upon the body of the deceased prior to the time he embalmed her.

Dr. A. J. Phillips, a witness for the State, testified that he participated in performing an autopsy on the body of deceased. He said he observed a puncture wound above the navel, which appeared to have been made with a trocar. Other than that wound there were no visible marks upon the body of deceased showing that she had been punctured with a trocar. At this juncture we quote from the testimony of the witness as follows: "The extent of the examination of the vulva and the opening of the vagina revealed nothing, but on inserting the speculum and bringing the cervix or mouth of the womb into view, the opening into the cervix or mouth of the womb showed as if some instrument had been sliding along the sides of it; it was raw and from the looks hadn't healed any, and looked as if done quite recently. That entrance had been made into the opening itself beginning at the cervical, came through the vagina. That could not have been done by a trocar inserted into the abdominal cavity." Testifying further, the witness said that in performing the autopsy he found a three and one-half or four months-old foetus in the womb of the deceased. He said: "When the foetus reaches that age it is, under ordinary circumstances, alive in the mother." Touching the condition of the foetus, he testified: "First, the uterus had been punctured a good many times by some sharp instrument. To go back to the foetus, the foetus ordinarily lies in the normal position, in what we call the arrow-way position. That means the head of the foetus lies in the abdominal cavity with the curve of the back to it. That means the head is down towards the cervix, towards the external opening; and on opening the external cavity and looking at the foetus it had a puncture wound through the skull, which shows would have had to have been made from below, upward. Naturally, these other puncture wounds showed they came from the same way." He testified, further, that there were "a lot of puncture holes" in the head of the foetus. As to the death of the deceased, he expressed the opinion that it had been caused by an attempted abortion. It was his further opinion that a sharp instrument had been used to puncture the head of the foetus. We quote from the testimony of the witness on redirect-examination: "From examining the body and the wounds that I have described I would say those wounds would have curtailed the woman's physical activities, a lot of pain to it. Some people

however, can bear more pain than others. The chances are after that was done, in my opinion, she wasn't able to do anything much."

Dr. W. H. Bennett, a witness for the State, gave substantially the same testimony as that of Dr. Phillips. Speaking of the wounds in the head of the foetus, he said: "A trocar inserted in her body could not have done that to the head of the foetus without going through the body of the foetus first because the head was below. I did not notice any holes in the body of the foetus." Further, he testified that there were a number of punctures in the uterus. Again, we quote from his testimony: "From the wounds I found in the foetus I don't think a woman could walk a mile with those wounds. As to whether it would curtail her physical ability, I would say it would just give her so much shock she wouldn't be able to do anything. At the time I examined the foetus, of course, it was dead." On cross-examination he testified as follows: "In my opinion a woman suffering wounds of that kind would die anywhere from a few minutes to several hours—sometimes shock develops in several minutes and then hours. Yet, it could have been twelve hours afterwards, but the reason I didn't think it could have been very long was because there was no reaction that had occurred around these punctures. If she had lived many hours there would have been some inflammatory condition around the punctures."

Appellant did not testify and introduced no witnesses.

It is manifest that the State relied upon circumstantial evidence. It is appellant's contention that the circumstances shown in the evidence are not sufficient to exclude every other reasonable hypothesis except that of her guilt. In short, she takes the position that the proof only amounts to a strong suspicion or mere probability of guilt. It is the rule that circumstantial evidence may be sufficient to show that the death of the deceased was caused by violence inflicted by another. Branch's Ann. P. C., sec. 1890; Lucas v. State, 155 S. W. 527. It must be determined before a conviction can stand that the circumstances are sufficient, when the measure of the law is applied, to show the agency of the appellant in the commission of an act of violence upon deceased. The corpus delicti consists of two things: first, a criminal act, and, second, the agency of the accused in the commission of such act. Section 1890, Branch's Ann. P. C.; Williams v. State, 65 S. W. 1060. The State, having relied upon circumstantial evidence, the circumstances must exclude every other reasonable hypothesis

except that of the guilt of the appellant, and if the proof only amounts to a strong suspicion or mere probability of guilt the conviction cannot stand. West v. State, 34 S. W. (2d) 253. In his Ann. P. C., section 1877, Mr. Branch states the rule as follows: "To sustain a conviction it should appear not only that an offense as charged has been committed, but there should also be proof to a degree of certainty greater than a mere probability or strong suspicion tending to establish that the party charged was the person who committed it, or was a participant in its commission. There must be legal and competent evidence pertinently identifying the defendant with the transaction constituting the offense charged against him."

Touching the criminal agency of the appellant, the evidence goes no further than to show the following: Deceased was in the home of the appellant on the occasion of her death. Prior to the time she died appellant had rubbed her with alcohol. The sheriff discovered a slop jar with some mucous in it. One of the children of deceased testified that they had seen deceased sit on a chamber or tin can. It was the opinion of the sheriff that he detected the odor of ether in the slop jar. It was the opinion of the physicians that deceased could not have walked a mile after the foetus had been punctured in the manner they disclosed in their testimony. The undertaker who embalmed the body of deceased, as disclosed by his testimony on cross-examination, could not say definitely whether the trocar he used punctured the uterus of deceased. However, he stated on his direct-examination, as heretofore pointed out, that he made no puncture in the pelvic region. The physicians testified that in their opinion the death of deceased was caused by a sharp instrument used in an attempt to procure an abortion. Further, it was shown in the testimony of the son of the deceased that appellant falsely stated to him that deceased had returned to her home, notwithstanding that she was then ill in the home of the appellant.

If the foregoing circumstances are sufficient to exclude every other reasonable hypothesis except the criminal agency of the appellant in attempting to procure the abortion, the conviction should stand. On the other hand, as already pointed out, if proof of such circumstances only amounts to a strong suspicion or mere probability of guilt the conviction should not stand. When we look further to the testimony we are unable to reach the conclusion that every other reasonable hypothesis except the guilt of the appellant has been excluded. As already stated, appellant was a midwife and a licensed nurse. The State elicited from the sheriff the fact that appellant stated

to him that deceased had come to her home, saying that she was suffering, and had requested her to treat her. The children of deceased gave no testimony showing that they saw appellant use any sharp instrument. They went no further than to say that they observed appellant rubbing the back of the deceased. A small quantity of rubbing alcohol was found in a bottle in the room near the body of deceased. The hypothesis would not appear to be unreasonable that deceased had attempted to perform an abortion upon herself and had come to the appellant, who was a licensed nurse, to relieve her suffering. It is true that the physicians were of the opinion that deceased could not have walked a mile after the head of the foetus had been punctured in the manner shown in their testimony. However, there was no definite testimony as to the distance between the homes of the deceased and the appellant. Only the two young children of the deceased testified as to the distance, and their testimony was wholly conjectural. One of the children placed the distance at about a mile, while the other said the homes of the parties were removed from each other about a fourth of a mile. Again, the physicians were not certain that deceased could not have walked the distance shown in the testimony of her children in the event an attempt to procure the abortion had been made prior to her visit to the appellant. While the children said their mother appeared to be in good health at the time they accompanied her to the home of the appellant, we cannot feel that such testimony, coming from children of tender age, when viewed in the light of all the circumstances, should be held sufficient to exclude the hypothesis that deceased or some other person had attempted to procure the abortion prior to the time deceased went to see the appellant. Living in the home of the deceased was her mother. She was not placed upon the stand by the State to show the physical condition of deceased on the occasion in question. Further, it is observed that no sharp instrument of any character appears to have been found in the home of the appellant. In short, when we view the record in its entirety, we are unable to escape the conclusion that the circumstances shown in the testimony fail to exclude every other reasonable hypothesis except the guilt of the appellant. So believing, it becomes our duty to order a reversal of the judgment.

The judgment is reversed and the cause remanded.

The foregoing opinion of the Commission of Appeals has been examined by the Judges of the Court of Criminal Appeals and approved by the Court.