THOMAS WILSON v. THE STATE.

No. 2063. Decided October 25, 1899.

**1. Homicide—Corpus Delicti.**

To sustain a conviction for felonious homicide, the corpus delicti must be proved; that is, (1) that the death of the deceased was caused by some criminal agency; and (2) that the defendant is the criminal agent.

**2. Same—Abortion—Post Mortem Autopsy.**

A post mortem autopsy in a case of death occasioned by abortion, to afford anything like a satisfactory result, must be made soon after the death of deceased and before the parts have become decomposed.

**3. Same—Evidence—Motive.**

On the trial of a father for the murder of his daughter in procuring an abortion upon her by means of medicine administered or instruments inserted into the uterus, there must be more proof than a motive or desire upon his part to hide her shame. The proof must amount to more than a mere suspicion that the medicines given by him produced the death, or that he inserted some instrument into her parts which put an end to her existence.

**4. Same—Evidence Insufficient.**

See opinion for facts stated which are held wholly insufficient to support a judgment of conviction of a father for murder in the second degree, in the perpetration of an abortion upon his daughter alleged to have been committed by administering poisonous medicines, and by inserting into her womb some hard instrument.

**5. Same—Improper Argument of Counsel.**

On the trial of a father for abortion committed upon his daughter which caused her death, it being claimed that he had ruined and gotten her pregnant, it was error to permit the district attorney to ask the jury to convict the defendant for fear he would seduce his other daughter, there being no evidence to warrant such argument.

**6. Same.**

On a trial for murder resulting from an abortion, the district attorney in his argument to the jury is not authorized to state that he could have proved a certain important fact by a female witness whom he had excused and told to go home, because she had cried and said she did not want to testify in the case.

Appeal from the District Court of Delta. Tried below before Hon. L. L. Wood, Special Judge.

Appeal from a conviction of murder in the second degree; penalty, ten years imprisonment in the penitentiary.

Appellant was charged by indictment with the murder of Minnie Wilson on the 18th of November, 1898, by administering poisonous medicines to her, and by inserting into her womb some hard instrument which the grand jury are unable to describe. Minnie Wilson was the daughter of appellant, and the State's theory was that he had ruined her and had killed her in his efforts to procure an abortion upon her.

The facts are fully stated in the opinion.

No brief on file for appellant.

*Rob't A. John*, Assistant Attorney-General, for the State.

HENDERSON, Judge.—Appellant was convicted of murder in the second degree and prosecutes this appeal.

The indictment charges murder in two counts. The first alleges the administration to deceased, Minnie Wilson, of fluid extract of ergot and oil of tansy, and other poisonous medicines, which caused her death; and the second charges appellant with the murder of the said Minnie Wilson by inserting into her womb some hard instrument, which can not be better described by the grand jurors. The conviction is general and may be applied to either count which the evidence sustains. The important question to be determined is, does the proof show with certainty that a conviction under either count can be sustained? It is elementary that in every case of felonious homicide, before a conviction can be sustained, the corpus delicti must be proved,— that is, (1) that the death of the deceased was caused by some criminal agency; (2) that defendant is the criminal agent. Looking to the testimony with reference to the first question, there is evidence tending to show that deceased, who was the daughter of appellant, was enceinte, and was several months gone in pregnancy, and that this condition had been produced by one Wood or her father. The proof further tends to show: That defendant knew of this condition of his daughter. That on or about the 8th of November appellant procured ergot and tansy (a half ounce of each), and administered the same to deceased from that time on up to shortly before her death, but in what doses is not developed in the testimony. He told several persons that his daughter was troubled with a cessation of her menses. He made no concealment either as to the procurement of the medicine or as to the complaint of deceased. He called in one Dr. Wall on the 8th of November to attend his daughter, who at that time prescribed potassium and aloes for her, to be taken three times a day. He was again summoned to see her on the night of the 14th of November, but, not being able to go, sent her some morphine and chloroform. He went to see

her the next morning. After remaining, conversing with defendant about an hour, deceased came into the house. She was better, but the doctor made no examination of her. The next day he was called again to see her, and then found her in a very critical condition. On examination, he found her pregnant, and the uterus considerably dilated, and miscarriage threatened. He then told defendant she was pregnant, who asked him if he could not be mistaken. The doctor then examined her again, and told him he was not mistaken. Defendant then asked him if he had suspected it before, to which he replied that he had not. Defendant remarked that he had begun to suspect it himself. Deceased appeared to be suffering greatly, and defendant asked him if she did not need some more chloroform, and he told him to give her a small dose. Defendant then told him he had sent to Commerce and got some oil of tansy and ergot, and had been giving it to her. He got the medicine he had gotten at Commerce, and it was nearly all out of the bottle; and the doctor told defendant that he had been giving it to her too fast, and defendant said that it had not done her much good, and that he had given her a double dose. The doctor then gave her a dose of laudanum and ergot, and left her some to take. He remained about a half hour after giving her the medicine, and she got quiet and went to sleep, and he then left. On cross-examination the witness stated that when he went to the house on the 15th he prescribed hot hip baths and a warm-water enema for deceased, and for the purpose of administering the enema, he let appellant have a female syringe; that he left ergot and laudanum to be given deceased in case she flooded; that he did not know until Wednesday, the 16th, that deceased was pregnant, and that he did not know whether her condition was natural or artificial; that he had no knowledge that deceased did miscarry. He stated that hot hip baths and warm-water enema would be dangerous to use on one pregnant; that he did not know deceased was pregnant when he recommended same for her use; that he had treated her merely on defendant's statements as to her condition at that time. It was shown by the evidence that defendant, with his two daughters, Minnie (the deceased) and Manila, lived by themselves in the farm house, and during part of the time one Wood and his daughter lived with them; that defendant appeared to be very kind and affectionate towards his two daughters. By one witness it was shown that after the deceased's death, in a conversation with defendant, he stated that, if Dr. Wall had done as he told him, that his daughter would not have died. A number of witnesses saw deceased during her last sickness, but no witness appears to have been present at her death, and we are not informed as to the immediate circumstances attending the same. It was shown by witnesses who came to the house after the death of deceased that some blood was on the bed, but how much we are not informed. Some time after the death of the deceased, Drs. Bennett and Harrison were employed by the sheriff of Delta County to make a post-mortem examination of the body of Minnie Wilson; and about three or four months after she died her body

was exhumed, and they took out the uterus, and found it considerably enlarged, and the base of it punctured. It was six or seven inches long. They also found a portion of the membranes and disintegrated blood in the uterus, and the uterus was soft and flabby. Dr. Bennett stated: That in his opinion, the puncture was made by introducing through the vagina and into the uterus some hard substance or instrument. That death would result from a puncture like the one found in the uterus. If inflammation set up from such a puncture, the person would probably live three days. If hemorrhage took place, death would result almost immediately; that is, as soon as a person could bleed to death. He further stated that, in his opinion, from an examination of the uterus, the woman had been pregnant, and was four or five months gone in pregnancy, and that a miscarriage had taken place; that in his opinion, death took place or resulted from hemorrhage. He further testified that oil of tansy is inert, according to medical authorities (that is, will not produce an abortion, but, given in large doses, would produce death); that oil of tansy has a tendency to produce great convulsions and smothering spells. Ergot has a tendency to check the flow of the blood. On cross-examination this witness stated that this was the first uterus he ever examined where the person had been dead three or four months; that he could not tell whether the abortion had been produced, or whether it was natural; that he could not tell whether the uterus was punctured before or after the abortion; that it could have been done before, or it could have been done after, abortion. If death resulted from hemorrhage in this case, the person would have lived just the length of time it would have taken her to bleed to death. This is substantially all the testimony that has a bearing on the cause of death.

In regard to the alleged poisoning of deceased, it will be noted that the evidence is exceedingly meager. We are not informed by the testimony of the peculiar symptoms of the deceased,—whether they were such as responded to ergot or tansy poisoning. The doctor who testified as to the contents of the vials when he saw them did not state how much was left in the vials, either of ergot or tansy. He remarked to appellant that he had given her a good deal, who replied that the doses did not seem to do her any good, and that he had given her a double dose. Evidently the doctor entertained no apprehension on this account, for he prescribed an additional dose of ergot. He also administered laudanum, and in that connection prescribed the use of chloroform, which was also administered to deceased. The autopsy that was subsequently made had no reference to poisons administered, but we are left to determine this question from the very unsatisfactory testimony in relation thereto. Both ergot and tansy, if given in sufficient doses, may produce death. We have here a part—perhaps the greater part—of a half ounce of each administered to the deceased during the period of nine days, and during this time we are not informed of the character of the symptoms with which she suffered. There is absolutely no testimony showing the immediate circumstances attending

her death, or the symptoms then manifested. It is possible that she may have died from the ergot and tansy already administered before the doctor was informed by defendant of his administration of said drugs, or she may have died from what had already been given her in connection with the additional doses of ergot given her by the doctor, or it is possible that she may have died from a further administration of chloroform. But these are mere possibilities. The proof of death by means of these poisons is not presented with that degree of certainty which the law requires. In a Mississippi case, where the circumstances of the deceased's death and the state of the body indicated poisoning by stramonium, or Jamestown weed, but it was also shown that the same symptoms might have been caused by congestion of the brain, stomach, or heart, it was held by the court that the confession of the defendant that he had administered to the deceased Jamestown weed was not enough to warrant a conviction, the corpus delicti not being fully proved.. See Pitts v. State, 43 Miss., 472. This case, however, does not go to the extent of that case, for here we have no proof that the symptoms attending the death of the deceased were of a character pertaining to poisoning by ergot and tansy. The only evidence contained in the record tending to show violence or physical injury to the parts of the deceased is that of Dr. Wall, to the effect that, when he called to see deceased on the day she died, he found her in a critical condition,—threatened with miscarriage, and that the uterus was considerably dilated; and that of another witness, that after the death of deceased he saw some blood on the bed; and that of Dr. Bennett that some three or four months after the death of deceased he and Dr. Harrison exhumed the body and examined the uterus, and found it enlarged and the base of it punctured. It will be noted that the witness Dr.. Wall does not describe the extent of the dilation of the uterus, and does not tell us that there were present any marks or indication of physical injury to the parts. He merely states that the uterus was dilated; that is, opened or enlarged. The quantum of blood found on the bed is not stated, so we are at loss to know whether there was flooding, indicating a miscarriage. It would seem, if there had been much blood, indicating great hemorrhage or flooding, that this would have been stated. When we come to the post-mortem examination, that is no more satisfactory. This was made, as stated by the witness, three or four months after the death of the deceased. We are not informed by the medical expert of the state of the body, nor does he tell us how well preserved the uterus appeared to be after this length of time. He merely states that the uterus appeared to be enlarged, and there was a rupture, and the base of it punctured. The books all teach us that an examination of this character, in order to afford anything like a satisfactory result, must be soon after the death of the deceased and before the parts have become decomposed. The puncturation is not further described; and, from the bare statement of the witness we can not tell whether the same was a traumatic perforation, or one occurring spontaneously. The physician himself could not

tell whether it was before or after abortion, which he testifies must have occurred. It could have been caused before, or it could have occurred after, abortion. We can not tell about these matters from the statements of the witness, and his bare opinion, without some detail of the facts, is entitled to but little weight. At any rate we are unwilling to affirm the judgment in the absence of that certainty of proof which the law requires. Doubtless appellant had a strong motive for producing an abortion on his daughter; and this, regardless of whether she had become pregnant through his machinations, or through those of Wood. In either event, it would be his desire to hide her shame, and so there is no question that he had a motive to do the acts attributed to him. But there must be more than this. There must be some proof, more or less cogent,—amounting to more than a mere suspicion, —that the medicines given by him produced her death, or that he inserted some instrument in her parts which put an end to her existence. It may be that the State is not able to furnish more proof than was made in this case, or it may be that on a new trial the State will be able to go into more of the details of the circumstances connected with the death of deceased, indicating the symptoms which attended it, or will show more of the details of the post-mortem examination. But, however that may be, it is no business of ours. We are only here to pass on the proof as we find it, and in our opinion the evidence adduced does not sustain either of the counts in the indictment.

Appellant reserved a number of bills to the introduction of evidence, but in our opinion the court did not err in respect to the admission of testimony. With reference to the other bills of exception, in regard to the remarks of the district attorney, we believe he was permitted to go further than was authorized by law. We do not think the prosecutor was authorized to ask the jury to convict the defendant for fear he would seduce his other daughter. There was no testimony to warrant this. Nor was it proper for the prosecutor to remark to the jury that he had excused the witness Miss Taylor because she cried and said she did not want to testify in the case, and he told her to go home, if he lost the case. This was not a proper response to the assertion of defendant's counsel that the State should have introduced some witness who saw the condition of the bedclothes of Minnie Wilson immediately after her death. The inference to be drawn from the remarks of the district attorney was that Miss Taylor would have made this proof if she had not been permitted to go home. We are not prepared to say that we would reverse the case on this ground alone, but we make the above observations with reference to another trial of the case. In all criminal prosecutions it should be the object of the State to stay within the record, and urge a conviction upon the testimony alone. Because in our opinion, as stated before, the testimony does not support the judgment of conviction in this case, the same is reversed, and the cause remanded.

*Reversed and remanded.*