## R. J. West and Tom Hernandez v. The State.

No. 13085.   Delivered March 12, 1930.
Rehearing denied December 10, 1930.
Second rehearing denied January 14, 1931.
Reported in 34 S. W. (2d) 253.

The opinion states the case.

*John A. Pope, Bismark Pope, D. M. Valdez, M. J. Raymond* and *John A. Pope, Jr.,* all of Laredo and *C. C. Thomas* of Cotulla, for appellant.

*R. D. Wright* of Laredo, *Robert Lee Bobbitt* and *Galloway Calhoun,* both of Austin, and *A. A. Dawson,* State's Attorney, of Austin, for the State.

CHRISTIAN, JUDGE.—The indictment contained several counts, the first count alone having been submitted to the jury. It was charged therein that appellants, "acting together, did then and there voluntarily and with malice aforethought kill Harry B. Williams by then and there choking him to death with their hands." A joint trial resulted in the assessment of a penalty of life imprisonment against appellant West and twenty years' confinement in the penitentiary against appellant Hernandez.

The state relied upon circumstantial evidence, the sufficiency of which appellants question.

To the point that deceased, Harry B. Williams, met a violent death at the hands of another, the circumstances are convincing. Deceased was a newspaper reporter for the Laredo Times. Buck Hood was an employee of the same paper. Hood and deceased went to the Commercial Hotel, an assignation house, in Laredo, shortly after midnight of January 18, 1929. In this house deceased was last seen alive sometime between midnight and 12:30 in the morning. On February 18, 1929, the body of deceased was found in the Rio Grande River near Laredo. There was no water in the lungs. The tongue was protruding from the mouth. A physician performed an autopsy. He testified that deceased was dead before his body entered the water; that if he had drowned the lungs would have been filled with water; and that the protruding tongue indicated that human hands had choked deceased to death. The body was in a state of decomposition and other marks of violence could not be detected. The body was positively identified as being that of Harry B. Williams.

It is the rule that circumstantial evidence may be sufficient to show that the death of the deceased was caused by violence inflicted by another. Branch's Annotated Penal Code, Section 1890; Morris v. State, 30 Tex. Cr. App. 95, 16 S. W. 757; Wilson v. State, 39 Tex. Cr. R. 365, 46 S. W. 251; Porch v. State, 50 Tex. Cr. R. 335, 99 S. W. 102; Lucas v. State, 155 S. W. 527. The opinion is expressed that the circumstances are sufficient to establish the fact that some person or persons, by the use of their hands, choked deceased to death, and cast his body into the river. A criminal act resulting in the death of deceased having been shown by sufficient evidence, it must be determined before a conviction can stand that the circumstances are sufficient when the measure of the law is applied to show the agency of the appellants in the commission of such act. The corpus delicti consists of two things: First, a criminal act, and second, the agency of the accused in the commission of such act. Section 1890, Branch's Annotated Penal Code; Lovelady v. State, 14 Tex. Ct. App. 560; Wilson v. State, 41 Tex. Cr. R. 180, 53 S. W. 122; Gay v. State, 42 Tex. Cr. R. 456, 60 S. W. 771; Williams v. State, 65 S. W. 1060. The state having relied upon circumstantial evidence, the circumstances must exclude every other reasonable hypothesis except that of the guilt of the appellants, and if the proof only amounts to a strong suspicion or mere probability of guilt, the conviction cannot stand. Branch's Annotated Penal Code, Section 1877; Pogue v. State, 12 Tex. Ct. App. 283; Hogan v. State, 13 Tex. Ct. App. 319; Kunde v. State, 22 Tex. Cr. App. 99, 3 S. W. 325; Gay v. State, 42 Tex. Cr. R. 450, 60 S. W. 771; Hernandez v. State, 72 S. W. 840. In his Annotated Penal Code, Mr. Branch states the rule as follows:

"To sustain a conviction it should appear not only that an offense as charged has been committed, but there should also be proof to a degree of certainty greater than a mere probability or strong suspicion tending to establish that the party charged was the person who committed it, or was a participant in its commission. There must be legal and competent evidence pertinently identifying the defendant with the transaction constituting the offense charged against him."

Touching the criminal agency of the appellants, the evidence is as follows: Appellant West was a deputy constable in Laredo, and appellant Hernandez was a city policeman. Love's farm was a few miles from Laredo. On the night of January 18, 1929 at about 9:30 Russell Love and another went to the police station in

Laredo and invited appellants to a party to be given at Love's farm. It was suggested that appellants bring some girls with them. Arrangements were also made for taking some liquor to the party. The Commercial Hotel in Laredo was an assignation house. On the night of January 18, 1929 the occupants of the hotel were Maria Alatorres, the proprietress, Alicia McCleod, Louisa Garcia Fee and Angela Gomez. To this house of prostitution the appellants went for the purpose of getting some girls to go with them to the party. According to the testimony of witnesses for the State, the first visit of appellants to the hotel was between 9:30 and 10:00 o'clock on the night in question, and they remained about twenty minutes. Appellants requested Louisa Garcia Fee and Angela Gomez to accompany them to the party. The proprietress of the house demurred, and the girls declined to go. According to the testimony of one of the occupants of the house, appellant West became very angry, called the proprietress "an old bawdy-house manager and a s— of a b—," and told the inmates of the house that he was going to put them all in jail on the following day. Appellants were drinking intoxicating liquor.

It was the version of the state's witnesses that appellants left the hotel and went to Love's farm, arriving there about 10:30 p. m. The owner of the farm testified that he referred to the fact that appellants had been unable to get any girls; that appellant West replied that the girls would not come out and that he "threw all the s—s of b—s in jail." Another witness testified that one of the parties present suggested to appellant West that he was "a hell of a rustler."

While appellants were at Love's farm Angela Gomez left the Commercial Hotel in company with one Johns. According to the testimony of the owner of the farm, appellants left the farm about 11:45 p. m. and returned to town. They again went to the Commercial Hotel, arriving there, according to state's witnesses, about midnight. Angela Gomez and Johns had not returned. At this time appellants, Maria Alatorres, Louisa Garcia Fee and Alicia McCleod were the only persons in the house, according to the testimony of the state. Louisa Garcia Fee testified that appellant West became very angry when he learned that Angela Gomez had left with Johns; that West said that if he could get hold of Johns and Angela he was going to put them in jail, as Angela had gone out with Johns and had refused to go with him. We quote the language of the witness: "And he kept on using curse words and

making threats that they were going to put us in jail and that we were not going to stay with anyone who came there." The state's version at this point, according to the witnesses, was that Louisa Garcia Fee and appellant Hernandez were sitting on one side of a bed in a room in the hotel and that appellant West and Alicia McCleod were sitting on the other side of the same bed; that while said parties were in the room together deceased and his friend Buck Hood entered the hotel; that a short time after midnight the proprietress called Alicia McCleod from the room to meet Hood, who desired to have sexual relations with her; that after talking to Hood for a few minutes, Alicia McCleod returned to the room where appellants and Louisa Garcia Fee were; that she came out in a short while and went with Hood to another room, where they remained ten or fifteen minutes.

The lobby of the hotel and the room referred to were on the same floor. When Hood went to the room with Alicia deceased was sitting in a chair in the lobby where he promised to wait until Hood was ready to leave the hotel. The lobby adjoined the room occupied by appellants and Louisa Garcia Fee. Hood and Alicia went to a room in another part of the hotel, there being two or three partitions between this room and the room occupied by deceased. At this point we quote the testimony of Louisa Garcia Fee as follows:

"The second time these defendants came back it was about a quarter past twelve. When they came back the second time there were present Maria, myself and Alicia. I do not remember of anybody else being there in that house at that time. At that time West was very angry and said that anywhere that he could get hold of Angela and Henry Johns he was going to put them in jail because she had been able to go out with him and we would not go out with them. And he kept on using curse words and making threats that they were going to put us in jail and we were not going to stay with anyone who came there. West was armed at that time—he had something around here and had a pistol. I saw the pistol. The last time he came he pulled that pistol out on me but not at this time. They came back there this time about 12:15, I think. Then at about that time two fellows came there; one was the one that was lost, Williams, and the other fellow somebody else. When these two men came in Hernandez and I were sitting on the bed, and West and Alicia was on one side, and then Maria called Alicia to her, and then Alicia went to a room with them. Then these two remained with me, and Maria went to the Fausto Hotel. Then

West went out of the room, and then he came back and spoke to Borrado (Hernandez) in his ear secretly. When West went out he stayed a few minutes, just nothing, just a second. I do not know where he went, I only saw him go out—he went out of the room and came right back in. I do not know what he told Borrado, I did not hear, because he spoke to him in his ear. Then Borrado followed him out and it was then that I heard them fighting in the office,—heard West and Hernandez. I heard curse words—all curse words. West told him, 'You American bootlegger s— of a b—.' I know West told him that, because when I heard them fighting there, I went to another room and hid behind the door. I heard three voices there during that fighting; they were Borrado and Raymond West's voices, and some other American's voice I heard. I only heard the curse words—they stayed there about four or five minutes, and then they went out. I heard something besides voices; I heard blows, and I heard the chair being pulled back and forth and feet rubbing on the floor. Then they went out and slammed the door. I do not know who went out and slammed the door; there was Raymond West and this other fellow—I did not see them, but I just heard the noise—they slammed the door. I do not know what took place right after the fight; they closed the door and I heard a car start away from right there from the corner, but I do not know whether they were in the car or not. That car was right there by the Commercial Hotel. They came back again later, about forty-five minutes later. After the fight the next thing I heard was I heard the man come from the rear rooms to go out. That was about five minutes after they left. It was Williams' friend."

Referring to the return of appellants to the hotel, the witness testified that it was about 1 :15 in the morning.

When the body of deceased was recovered from the river two watches were discovered, one being a wrist watch. The wrist watch had stopped at twenty minutes after one and the other watch at ten minutes after one. Before going to the Commercial Hotel Hood and deceased had been drinking in some cafes across the river. They had eaten at about four o'clock in the afternoon. Between that time and the occasion of their visit to the Commercial Hotel, Hood had not taken any more food and had not seen deceased eat. The autopsy disclosed that the stomach of deceased was practically empty, there being only a small amount of grease and small particles of tomatoes therein. As hereinbefore stated, according to the testimony of the state, deceased was last seen alive in the lobby

of the Commercial Hotel while seated in a chair awaiting his friend Hood. Present at the time were the proprietress of the hotel, Hood, Alicia McCleod, Louisa Garcia Fee, appellants and deceased. The body of deceased was recovered from the river Feb. 18, 1929, approximately thirty days from the date of his disappearance. The condition of the body as to decomposition and the accumulation of moss and slime thereon led the justice of the peace, who had had experience in handling bodies recovered from the river, to express the opinion that deceased had been in the water for about thirty days.

In an effort to establish an alibi, appellant Hernandez and other witnesses testified in behalf of the appellants. Appellant West did not take the witness stand. In giving his testimony, appellant Hernandez admitted that a party had been arranged at the Love farm and that he and appellant West went to the Commercial Hotel for the purpose of taking some girls with them. He denied that they went to Love's farm and reported the fact that they were unable to secure the presence of the girls. He testified that they left the Commercial Hotel after their first visit at about 11 o'clock and went to the police station; that they drove around town; and secured some intoxicating liquor, a part of which they drank; that they returned to the Commercial Hotel a little after midnight; that they had not been to Love's farm in the meantime; that shortly after their return to the hotel Alfredo Garcia, Julian Garcia, Enrique Guerro and Lazero Sanchez came to the hotel with some intoxicating liquor; that they had a few drinks with the parties; that appellant Hernandez and Julian Garcia left the hotel for some more liquor, returning in about fifteen minutes; that upon their return to the hotel on the second occasion he saw Hood and deceased together in the dining room of the hotel and spoke to Hood; that he did not see deceased at any place on the night of January 18, other than inside the Commercial Hotel in the dining room with Hood; that he had never told any person that he had seen him at any other place; that he, appellant West, Alfredo Garcia, Julian Garcia, Enrique Guerro and Lazero Sanchez left the hotel before one o'clock and arrived at Love's farm at one o'clock a. m., where they remained until five o'clock in the morning. He denied that he and West had anything to do with the death and disappearance of deceased. There appears to have been no denial of the fact that the appellants had engaged in a fight with some American in the lobby of the hotel on the night in question.

On the question of alibi, Maria Alatorre testified for the appellants that deceased left the hotel while Hood was in the room with Alicia McCleod, and that at such time appellants were in a room with Louisa Garcia Fee.

There was testimony from the state's witnesses, as well as those of appellants, that deceased had first told Hood when Hood requested him to wait for him, that he was going home. However, the last statement of deceased was that he would wait for Hood, and he seated himself in a chair in the lobby of the hotel.

In rebuttal, the state proved by the witness Fierros that he had a conversation with appellant Hernandez after the disappearance of deceased; that Hernandez stated to him that he (Hernandez) was standing in front of Pappas Hotel near the Commercial Hotel on the night of January 18, when he saw deceased leave the Commercial Hotel about 12:30 a. m. and walk down a street in the city of Laredo; that deceased was drunk. Other state's witnesses testified that they talked to appellant West about the disappearance of deceased. One of those witnesses said that West stated to him that he had seen deceased the last time in the Commercial Hotel on an occasion when there was a little disturbance there; that deceased was drunk; and that deceased left the hotel about midnight or 12:30 a. m.

The owner of Love's farm testified that appellants left the farm that night at 11:45 and did not return. He said that they were not there at 5 o'clock in the morning. He further testified that he went to bed at 11:45, at which time the party had broken up. Some of the witnesses testifying as to an alibi placed appellants at Love's farm before 12:40 and continuously until 5 a. m.

After the disappearance of deceased Maria Alatorre was questioned about the matter. Touching a conversation had with her, a witness for the state said: "It is a fact that at that time and place Maria Alatorre stated to us gentlemen and in the presence of these other gentlemen on Friday night, January 18, around 12:30, Harry Williams, or a man described as Harry Williams, was there in her hotel, and that he was sitting in a chair, that she went away to attend to some work—to do some work, and when she came back he was gone and she did not know what became of him, or words to that effect."

We are unable to reach the conclusion that the jury were not warranted in finding that the circumstances excluded every other reasonable hypothesis except that of the guilt of appellants. If

the jury believed the testimony to the effect that the alibi of appellants was fabricated, that is, that they were not at Love's farm from shortly after midnight until 5 o'clock in the morning, they were authorized to conclude that the evidence touching the alibi showed an effort and scheme on the part of the appellants to shield themselves from the force and effect of the testimony tending to connect them with the murder of deceased. Viewed in such light, the testimony destructive of the truth of the defense of alibi presented a criminative circumstance against the appellants. Considering such circumstance in connection with the other evidence in the case, we are of the opinion that the state's theory that the appellants choked deceased to death in the lobby of the Commercial Hotel shortly before 12:40 a. m. on the night of January 18, 1929, placed his body in a car, took him to the banks of the Rio Grande River and threw him in the water to conceal the crime, is sufficiently supported by the record.

Briefly the cogent circumstances are: Appellant West had been chided for his failure to bring girls to the party at Love's farm. He became enraged and stated to the inmates of the Commercial Hotel, in substance, that none of the girls would be permitted to stay with any other man. About the time this statement was made deceased and Hood appeared at the hotel. One of the girls with whom appellant was in the room was called out for the purpose of staying with Hood. At this time deceased was waiting for Hood, as he had promised to do, in a chair in the lobby near the room occupied by appellants. There deceased was last seen alive. No one else was in the lobby. Appellant West left the room, shortly returned and whispered something to Hernandez. They went into the lobby; scuffling was heard; blows were struck and the voices of appellants and of an American were heard. Appellant West, cursing and using angry language, called the third party "an American bootlegger s— of a b—." The parties left the room and a car was heard to leave. Shortly after they left Hood came back into the lobby and found deceased gone. Appellants returned to the hotel in about forty five minutes. The difficulty occurred in the lobby shortly before 12:40. When the body of deceased was taken from the river his watches had stopped at 1:10 and 1:20, the time practically coinciding with the time appellants returned to the hotel after the difficulty. No shots had been fired in the hotel. The tongue of deceased was protruding when his body was recovered. The doctor testified that the protruding tongue indicated that human

hands had choked him to death. There was no water in the lungs. He was dead when placed in the water. There was practically no food in the stomach. Deceased had eaten about four o'clock in the evening of the day of his disappearance. All of these circumstances appear to be consistent with each other and with the guilt of the appellants. Taken together, we deem them to be of a conclusive nature, leading on the whole to the satisfactory conclusion and producing, in effect, a moral certainty that the appellants committed the offense charged. They are sufficient, in our opinion, to exclude every other reasonable hypothesis except that of the guilt of the appellants.

It seems to be appellants' theory, as disclosed by the brief, that some other person had killed deceased because of improper relations on the part of deceased with some female relative. Attention is called to the fact that deceased had received letters from a young lady in which she had advised him that her father was not pleased with their relations. Again, attention is called to the fact that deceased had been in a party, shortly before his disappearance, across the river, and that a married woman, unescorted by her husband, had been present. Further, attention is directed to the fact that when the body of deceased was removed from the river an open "condrum" floated down the river. The party testifying to seeing the "condrum" said it at first appeared to be a ring and then opened up and floated away. Appellants argue from this circumstance that deceased had had illicit relations with some woman before his death. We gather from the brief that it is contended that it was highly probable that such relations were had under conditions that necessitated the carrying away of the used rubber before disposing of it; and that it was highly probably that some offended male relative of the woman, upon discovering the illicit intercourse, had killed deceased.

In view of all of the circumstances disclosed by the record, we deem the letters received by deceased from the young lady and the fact of the discovery of the open rubber unimportant. There was no evidence that deceased was with any other person than Hood and the occupants of the Commercial Hotel on the night of his disappearance. The circumstances are cogent to the effect that the appellants were alone with deceased in the lobby of the hotel on the occasion he was last seen alive. Appellants' theory that someone else killed deceased is unsupported by any evidence. We deem such theory purely speculative, and express the opinion that no rea-

sonable hypothesis of the guilt of another or others can logically arise from the two circumstances referred to when they are considered in connection with all of the evidence in the case.

Bill of exception No. 3 discloses that state's witness Louisa Garcia Fee was required to testify over appellants' objection that appellant West was armed on the night of January 18, 1929, when he came to the Commercial Hotel. The trial court certifies in the bill of exception that appellant Hernandez testified without objection that he and appellant West were armed while in the Commercial Hotel on the night in question. As the same fact was before the jury from another source without objection on the part of appellants, the reception of the testimony mentioned in the bill, if erroneous, would not warant a reversal.

It appears from bill of exception No. 4 that Louisa Garcia Fee, a witness for the state, testified that she had heard fighting in the office of the Commercial Hotel; that she heard appellant say: "You American bootlegger s— of a b—"; that she went into another room and hid behind a door; that she heard the voices of Hernandez and West, and also another American's voice; that the parties remained there about four or five minutes and then went out; that she heard blows and heard the chair being pulled back and forth and feet rubbing on the floor; that when the parties left they slammed the door; that she did not know what took place right after the fight; that after the door slammed she heard a car start away from the building; that appellants Hernandez and West came back in about forty-five minutes after the door slammed; that about five minutes after she heard the door slam deceased's friend Buck Hood came out of a room in the hotel and left. Upon cross-examination, the witness was asked by appellants this question: "Now isn't it a fact that you have stated to the lawyers here and in the presence of the attorneys representing the state in the office of Pope, Pope, Valdez and Pope, and in the presence of Mr. Raymond, Judge Pope, Mr. Valdez, Mr. Wright, Mr. Neblett and myself that all you heard was some chairs squawking like they were getting up and a few curse words?" The State objected to the question on the ground that it was not the proper way to impeach a witness, and that appellants had no right to impeach the witness by the statements of their own attorneys. The objection was sustained. Appellants clearly had the right to impeach the witness by showing that she had made statements to appellants' attorneys which contradicted her testimony upon the trial. However, it was incumbent upon

appellants to lay a proper predicate for the impeachment of the witness. Before a party is entitled to contradict a witness by proof of contradictory statements, the attention of the witness must be directed to the time, place and person to whom it is claimed the contradictory statement was made. Branch's Annotated Penal Code of Texas, Section 179; Roach v. State, 41 Tex. 263; Mitchell v. State, 41 S. W. 816; Martinez v. State, 53 S. W. 634. The predicate included the names of the persons to whom it was contended that the contradictory statements were made, and called attention to the place, but failed to specify the time. The court certifies in the bill that it appeared from the testimony that appellants' counsel had talked to the witness on several different occasions about the case. The witness was entitled to have her attention called to the specific time inquired about. Also the bill of exception fails to state what the answer of the witness would have been if the court had permitted her to answer the question. It is the rule that a bill of exception taken to the refusal of the court to permit a witness to answer a question, either upon direct or cross-examination, must disclose what the answer of the witness would have been. Branch's Annotated Penal Code of Texas, Section 212. In Kyle v. State, 116 S. W. 598 a similar situation was presented. There the appellant offered to impeach a witness for the State by asking him if he had made statements contradicting his testimony given upon the trial. In declining to review the question sought to be presented, this court held that the bill was defective in failing to show what the answer of the witness would have been.

Bills of exception Nos. 5, 8 and 9 are in question and answer form. No certificate by the trial judge showing the necessity for such form appears. Under the decisions of this court, the bills are insufficient. Tims v. State, 20 S. W. (2d) 770, and authorities collated.

Bill of exception No. 7 presents the following occurrence: The justice of the peace holding the inquest testified that in his opinion the body of deceased had been in the river about thirty days. Appellant objected on the ground that the witness was not shown to be qualified. Before expressing the opinion the witness had testified that during many years in the office of justice of peace he had examined several bodies which had been taken from the river. He described the condition of deceased's body, showed to what extent decomposition had set in, and stated that moss and green slime had accumulated on the pants' legs and shoes. He testified that he had

had a great deal of experience in cleaning out cement tanks, and that he knew how long it took for slime and green moss to form in such tanks. He knew the length of time bodies recovered from the river, and which he had examined, had remained in the water. He had observed their condition. We deem the predicate sufficient to warrant the reception of the opinion. We do not understand that the opinion was conjectural and uncertain. It was not upon a matter on which the jury was as competent to form an opinion as the witness.

Bill of exception No. 13 presents an alleged erroneous argument on the part of the district attorney. It appears that while the district attorney was making his closing argument he used language as follows: "That the said Harry B. Williams, the deceased, left a widowed mother in another state, and that he was her only son and if the jury could but see the letter that he had just received from that dear old mother." Appellants objected to the argument on the ground it was prejudicial and calculated to play on the sympathy of the jury, and requested the court to instruct the jury not to consider the remarks. The court overruled the objection and refused to withdraw the remarks. Whereupon the district attorney said: "I will withdraw the statement objected to and anything else which is not in line with the record, but I just want to say that he did have a mother." Appellants again excepted. It is recited in the bill that none of the argument excepted to was invited. It is not certified that there was no evidence before the jury to the effect that deceased had left a widowed mother in another state and that deceased was her only son. If the evidence showed such fact it was proper for the district attorney to comment upon it. The bill, in failing to show that the statement relative to the mother was not supported by the evidence, is insufficient. As to the district attorney's reference to the letter, it is observed that he himself withdrew the remark. The jury did not knew what was in the letter. In the state of the bill, we would not feel authorized to hold that reversible error is presented.

It is averred in the motion for a new trial that a juror, after he had been impaneled, had conversed with his wife without the knowledge or consent of appellants, and not in the presence of the court. It was incumbent upon appellants to support this allegation by proof that the juror conversed with his wife. The juror was not tendered as a witness nor was his affidavit appended to the motion for a new trial. Neither was the affidavit introduced before the court. Again,

the court was not requested to bring the juror in in order that he might be interrogated relative to the matter. Appellants contented themselves with placing upon the witness stand one of their attorneys who testified that the juror had told him that he had conversed with his wife about some business that she came to see him about. He further testified that, as we understand the record, that the conversation was had in this manner: The juror wrote a statement for his wife and handed it to the deputy sheriff in charge of the jury, who read everything that was written and gave the statement to the wife. The juror did not tell the witness that his wife answered the message. We are of the opinion that the hearsay statement of appellants' counsel was not sufficient to discharge the burden imposed upon them of showing that the juror conversed with an outsider. It is the rule that where the evidence shows a violation of the statute prohibiting a juror after impanelment from conversing with an outsider that presumption of injury obtains. Unless the presumption of injury is overcome by evidence, it is incumbent on the trial court to grant a new trial; and where a juror is shown to have conversed with an outsider it is the announcement of the decisions that the person with whom he talked must be presented to rebut the presumption of injury, the decisions being to the effect that the testimony of the juror alone is not sufficient. Toussaint v. State, 244 S. W. 514. The facts here are not within the rule to which reference is made, and the court properly overruled the motion for new trial in so far as it was predicated on misconduct of the jury.

It is averred in paragraph 5 of the motion for a new trial that the court erred in refusing to permit appellant to impeach the witness Louisa Garcia Fee by requiring her to answer the question referred to in our discussion of bill of exception No. 4, it being alleged that appellants would have been in a position to have proven by their attorneys, as well as counsel for the state, that the witness had stated to them that she heard nothing more on the occasion of the disappearance of deceased than a few curse words and some chairs squeaking like people getting up. It appears that the court heard the testimony of one of appellants' attorneys in support of this allegation in the motion. This witness testified that the witness told him in the presence of others that she only heard cursing, and the moving of chairs. We do not understand that the testimony heard on the motion for a new trial can be taken to aid the recitals of bill of exception No. 4. It was at the time the

testimony was offered that appellant was called upon to lay a proper predicate for impeaching the witness. Again, it was at such time that it should have been shown what the answer of the witness would have been after proper predicate had been laid and the court had refused to permit her to testify.

We quote paragraph 15 of the court's charge as follows:

"You are instructed that the testimony of the witnesses W. T. Hill, Seb. S. Wilcox and J. E. Trout, as to statements alleged to have been made by defendant, R. J. West, about Harry B. Williams, if any statements were made, can be considered against defendant R. J. West, and not against defendant Tom Hernandez."

Paragraph 16 reads as follows:

"You are instructed that the testimony of the witness J. L. Fierros as to statements alleged to have been made by defendant Tom Hernandez about Harry B. Williams, if any statements were made, can be considered against defendant Tom Hernandez only, and not against defendant R. J. West."

Appellant objected to the foregoing paragraphs "for the reason that the said paragraphs and each of them are charges upon the weight of the evidence, and asks that same be stricken out." It would appear under the evidence that it was proper for the court to instruct the jury that the statements made by Hernandez could not be used against appellant West. The statements were made out of the presence of West and several weeks after the disappearance of deceased. For example, in the absence of appellant West, Hernandez stated to the witness Fierros, according to this witness' testimony, that he saw deceased leaving the Commercial Hotel on the night of his disappearance and watched him walk down Flores Avenue; that this was about 12:30 a. m.; and that deceased was drunk. Hernandez had testified in his own behalf that he did not see deceased on the night in question at any place except in the Commercial Hotel in the dining room, with his companion Hood. It is manifest that it would have been improper for the jury to use the testimony of Fierros against appellant West. Similar statements were made by West in the absence of Hernandez several weeks after the disappearance of deceased. These statements, if the jury believed that West made them, showed an effort on the part of West to shield himself from the force and effect of his presence in the Commercial Hotel at the time of the disappearance of deceased. It would seem to have been proper for the court to advise the jury that these statements could not be used against Hernandez. It is

manifest then that a part of the charges complained of were proper and not subject to the objection that they were on the weight of the evidence. In his brief, appellant calls attention to the fact that that part of the charge in which the jury were advised that the statements of West, if any were made, could be considered against West, was on the weight of the evidence in that it singled out testimony and advised the jury that they could use it as criminative circumstances against the appellant. We are in accord with appellants' view. The question is: Was the objection sufficiently definite to make reasonably apparent to the trial judge the fault complained of, when the charge complained of and the objection are considered together? Our statute requires that before the charge is read to the jury the defendant "shall present his objections in writing, distinctly specifying each ground of objection." Art. 658, C. C. P. While no form of objection is prescribed, under the statute a general objection is not ordinarily sufficient to bring in review the action of the trial court in refusing to amend the charge. In Gill v. State, 208 S. W. 926 it was held that the general objection that the charge in question was on the weight of the evidence was insufficient, when considered in connection with the charge, to make reasonably apparent to the trial judge the faults of which complaint was made. Here, considering the appellants' objection in connection with the fact that a part of the charge complained of was proper, we are of the opinion that the objection was not sufficient to make reasonably apparent to the trial judge that appellants were complaining because a portion of the paragraphs constituted a charge on the weight of the evidence.

As stated before, the witness Fierros testified that Hernandez told him after the disappearance of deceased that he had last seen deceased leaving the Commercial Hotel and walking down a named street in the city of Laredo. Other witnesses testified that appellant West had told them that he last saw deceased some time after twelve o'clock at night on the occasion of his disappearance on the street near the Commercial Hotel. It was appellants' contention that these statements were exculpatory and they requested the court to charge the jury that the state, having introduced said statements, was bound thereby, unless the state had proven beyond a reasonable doubt that the statements were false. The statements were inculpatory in so far as they tended to show that the account given by the appellants of their connection with the disappearance of deceased were untrue and known by the appellants to be untrue. The effect of the statements, without further reciting the evidence, if it was

believed that they were true, was to destroy the defense of alibi. In short, the statements in question tended to show that the evidence offered by the appellants as to an alibi was fabricated, and thus had the effect, if believed, to present an incriminating circumstance against the appellants. Gibson v. State, 110 S. W. 41. It is not in every case that the trial court commits reversible error in refusing to charge that the state is bound by the exculpatory statements it introduces unless disproved beyond a reasonable doubt. The necessity for such charge is referable to the facts. We quote from Foster v. State, 296 S. W. 537, as follows:

"In this case the state was not relying upon a confession, and apparently the statements referred to were introduced upon the theory that they were part of the res gestae. In some cases it is stated that, when the state does not rely for conviction alone upon the admissions or confession of the defendant, but introduces evidence in rebuttal of the confession and admissions, it is not error to refuse to charge that the state is bound by such exculpatory statements, and we find Slade v. State, 29 Tex. App. 392, 16 S. W. 253; McKinney v. State, 48 Tex. Cr. R. 404, 88 S. W. 1012, and other authorities cited. Other cases hold that, when the theory embraced in the exculpatory statements is plainly submitted, it is not error to fail to give the charge that the testimony must show the falsity of such statements. Harris v. State, 103 Tex. Cr. R. 479, 281 S. W. 206."

In the instant case sufficient evidence was introduced by the state to disprove the statements claimed by appellants to be exculpatory. Not only is this true, but the theory of alibi was embraced in the statements claimed to be exculpatory, and the court gave a correct charge on alibi. Again, the state did not rely upon a confession or admissions on the part of appellants for a conviction. It follows that an application of the principles controlling supports the conclusion of the trial court that the facts did not warrant the giving of the charge.

Some of the questions presented have not been discussed. However, we have carefully examined each contention made, and fail to find reversible error.

The judgment and sentence are reformed to show that appellant West is condemned to confinement in the penitentiary for life and not less than two years, and that appellant Hernandez is condemned to confinement in the penitentiary for not less than two nor more than twenty years.

As reformed, the judgment is affirmed.

*Affirmed.*

The foregoing opinion of the Commission of Appeals has been examined by the Judges of the Court of Criminal Appeals and approved by the Court.

### ON MOTION FOR REHEARING.

MORROW, PRESIDING JUDGE.—In the light of the voluminous record, the appellants' motion for rehearing has been examined with such care as the members of this court are capable. The legal questions raised in the motion are not different from those heretofore presented and discussed in the original opinion. So far as it relates to the legal questions, the conclusion heretofore reached and stated is in harmony with the present view of the court.

The matter that has given the members of this court most concern is that which assails the sufficiency of the evidence to support the conviction. In practically all cases depending upon circumstantial evidence alone, the court is confronted with the similar difficulty. The testimony adduced upon the trial is summarized copiously and accurately in the original opinion. A further statement of it would be but a useless reiteration. Much of the criminative evidence comes from witnesses whose vocation and character render their veracity open to question. The locality and environment in which the appellants placed themselves on the night of the tragedy rendered the use of the inmates of the habitation in which, according to the State's theory, the deceased was last seen alive, essential witnesses for the State. The testimony of such witnesses and others, if believed, presents a state of facts which was regarded by the jury as sufficient to designate the accused guilty of the crime. The testimony was given under the eye and in the hearing of the learned judge who tried the case and by him, upon the motion for rehearing, has been deemed such, when tested by the strict rule applicable to circumstantial evidence, as is sufficient to warrant the conviction of the accused. Being remote from the scene of the trial and guided alone by the written record and the action of those who heard the testimony, observed the witnesses and under the sanctity of oath have rendered and approved the verdict, this court does not feel justified in annulling the judgment.

The motion for rehearing is overruled.

*Overruled.*

### ON REQUEST FOR LEAVE TO FILE SECOND MOTION FOR REHEARING.

HAWKINS, JUDGE.—Appellant has presented a request for leave to file a second motion for rehearing. In the document is a

reference to the result of another case and copies of court proceedings therein. These matters have no proper place in the present record and will be stricken from the document.

All other matters in the request, save those hereafter mentioned, have had consideration on original submission and on rehearing and will not be again reviewed.

In the original opinion bills of exception 5, 8 and 9, were not considered because in question and answer form, without a certificate from the trial judge that in his opinion it was necessary to incorporate the questions and answers to elucidate the point involved. Art. 760, Subd. 3, C. C. P. (1925). Cases are collated in Note 23, under Art. 667, Vernon's C. C. P., Vol. 2. In his motion for rehearing appellant directed attention to the fact that said bills on their face show to have been prepared by the trial judge in lieu of bills presented by appellant. In some way this escaped our attention. Art. 667, C. C. P. (1925) refers us to the Civil Code for the "rules" regarding the preparation of bills of exception. Art. 2237, Subd. 8, R. C. S., Vol. 1, (1925) directs that the judge under certain circumstances shall prepare such bills of exception as he thinks reflects the ruling of the court and file it with the clerk. This having been done in the present instance appellant had no control over the form of the bills and unless they are considered it is tantamount to depriving appellant of his bills on the points involved therein, hence they will be considered.

Bill number five shows that Louisa Garcia Fee, a state's witness, had testified that she was taken before the grand jury during their investigation of Harry Williams' death and that she refused to testify because she was afraid of West (one of the appellants) and that she was brought before the District Judge who remanded her to jail; that she decided to testify and was again taken before the grand jury and did testify before that body. There is then set out in the bill a page and a half of questions and answers on the cross-examination of the witness, at which point a question was asked which state's counsel deemed argumentative and objection was interposed on that ground and was sustained. If any exception was taken to the court's ruling the bill fails to show it, and totally fails to show what the witness' answer would have been if the question had been permitted. The bill then proceeds with three or four pages of questions and answers relative to witness being taken to jail, at whose order, and about her return to the grand jury. The only tangible thing discoverable occurred when appellant's counsel asked the following question. "They took you before the grand jury

and told you to swear the way they wanted you to swear it and they turned you loose, didn't they?" to which the witness answered, "No, sir, they did not." After the witness had answered counsel for the state objected to the form of the question and the court remarked, "I do not understand that as proper cross procedure, I never heard of it being done in my life before." Exception was taken to the court's remark. It is not made to appear by said bill that counsel was in any way restricted in the cross-examination of this witness, and we fail to discover anything in the court's remark which violates Art. 707 C. C. P. (1925) which precludes the trial judge from commenting upon the weight of the evidence or its bearing on the case, or making any remark calculated to convey to the jury his opinion of the case.

Bill number eight reflects that Alicia McLeod testified that after she left the room where she had been with Buck Hood that she went to the kitchen where she met Maria Alatorres, the proprietress of the house, gave her a dollar, and said that Maria told her to hide because there were some officers in the front room; that witness did hide as directed by Maria. Bill number nine shows that this same witness testified that when she came out of hiding Maria told witness "the scandal was over," and for her to go upstairs where a boy was waiting for witness. The bills show that in each instance appellants objected to what Maria said to the witness as not being res gestae, and being said out of appellants' presence. The court seems to have admitted it as res gestae. We consider it unnecessary to discuss the ruling of the court from that angle. Appellants used Maria Alatorres as a witness and from her the state elicited without objection from appellants the testimony that she did tell Alicia McLeod everything said witness claimed was told her by Maria, save that the latter denied saying to Alicia that the "scandal was over." It has long been the accepted rule that where evidence from one witness is objected to but the same evidence goes into the case from another witness without objection that no reversible error is shown. We refrain from discussing the principle but refer to Machado v. State, 112 Tex. Cr. R. 538, 17 S. W. (2d) 1060 and Stone v. State, 22 S. W. (2d) 140, in which cases many authorities both old and recent are collated. This disposition of the matter leaves only for consideration the sole controverted statement that "the scandal was over." It is shown in bill number nine that witness McLeod was asked what was the "scandal" and replied, "I do not know, she (Maria Alatorres) just

said 'the scandal.' ". If it be conceded that this statement was hearsay it by no means necessarily follows that it would call for a reversal. It seems to have been pretty well established that the officers were in a bad humor because the girls would not go with them to the Love farm, and that West made threats to arrest all of them, including Maria Alatorres, and put them in jail. The inmates of the house were considerably disturbed over the situation, and Maria's statement to Alicia may well be attributed to the confusion and disturbance caused by the threats of West, which Maria thought was over, the officers having gone. She claimed the reason she told Alicia to hide was because she (Maria) did not want Alicia to accompany the officers to the farm in question, and after they left she called Alicia from hiding and according to Alicia's testimony, used the language indicated. If it was hearsay, in our opinion, it presents no such damaging matter as would demand a reversal.

Having fully considered the bills appellants' second motion for rehearing is denied.

*Overruled.*