ROY EDWARD McCALLUM V. STATE

No. 26,845. March 17, 1954
Rehearing Denied April 28, 1954
Appellant's Second Motion for Rehearing Denied
(Without Written Opinion) May 26, 1954

*Croslin & Pharr,* by *E. G. Pharr,* Lubbock, for appellant.

*Wesley Dice,* State's Attorney, Austin, for the state.

BELCHER, Judge.

Appellant was convicted of murder without malice upon an indictment charging that he did "voluntarily and with malice aforethought kill Gus. L. Pierce by some means and manner to the Grand Jurors unknown," and his punishment was assessed at five years in the penitentiary.

The sufficiency of the evidence to support the conviction is challenged in two particulars, which are: (1) that the evidence is insufficient to establish the corpus delicti, and (2) that if the corpus delicti has been shown, there is no evidence that appellant was criminally connected therewith.

In order to establish the corpus delicti in cases of homicide, there must be shown a criminal act and the resulting death, and the agency of the accused in its commission. This proof may be made by circumstantial evidence. Bell v. State, 149 Texas Cr. R. 509, 196 S.W. 2d 923; West v. State, 116 Texas Cr. R. 469, 34 S.W. 2d 253.

If the criminal act resulting in the death of the deceased has been shown, the guilt of the accused is established when the evidence shows that he was criminally connected with the death of the deceased.

The facts in this case must be examined and applied in the light of these rules.

The state relies upon circumstantial evidence to establish the offense charged.

The testimony shows that appellant and the deceased began bowling at the Lubbock Bowling Alley about 8 P.M. on April 30, 1953; that they had some argument and a scuffle, with no injuries, which soon ended and they continued in a good humor until about 11:30 or 11:40 P.M., on April 30, when they got into appellant's automobile; and that both were drinking.

Argust Curtis testified that some 35 minutes later (about 12:10 or 12:15 A.M.), he saw appellant stop his automobile in front of the hospital with one man (the deceased) in the automobile, to whom the appellant said: "Gus, we're at the hospital. Do you want to go in here, or do you want me to take you home?" The deceased did not answer the question. The witness stated he offered to help the appellant but that appellant declined saying "No, he's as able to go in the hospital as I am." The witness said that he left the scene for a moment and upon his return observed the appellant trying to pick up the deceased who was lying face down on the ground, and that he helped place him in the emergency room; that when appellant was asked how it happened and where "he said that he didn't know anything about it, that he picked him up out at the edge of town, and brought him to the hospital"; that appellant stayed there two or three minutes, then left to telephone his wife and returned about forty-five minutes or an hour later at which time he was cleaned up and had on a clean shirt.

Police Officer Stephens testified that he was standing inside the emergency room door when he saw appellant stop his automobile at the hospital between 12:05 and 12:15 A.M.; that he asked what happened and appellant said "I found him out on the Tahoka or the Lamesa Highway, laying beside the road," and appellant further said "I don't know who the man was. I just found him out there." He further testified that he smelled liquor on appellant and saw blood on his shirt.

Deputy Sheriffs Harvey and Chapman testified that they saw appellant about 1:50 A.M. and asked him if he was the man that brought the injured man to the hospital; that appellant said "What injured man?"; then later told them that he did bring the man in; that they got the shirt appellant had removed and it had blood on it with one button hole torn out; that he took them six miles out on the Slaton Highway and pointed out the place "where it happened." Witness Chapman said "Mr. McCallum told us that he could take us out there to the spot where the deceased fell out of the car." At this place they "found a pair of glasses * * * lower plate of false teeth, which the defendant said belonged to Mr. Pierce, and a cigarette holder he said belonged to him;" and, in describing the condition of the ground where these articles were found, said: "the wind had swept the ground very clean, * * * there weren't no loose dirt left on the ground surface at all, * * * and the surface was very hard and there weren't no large rocks at all," but there were some small ones "about the size of a golf ball, at the largest;" and they found " a spot of blood on a pebble where these other articles were found."

Dr. Lane testified as follows: "The nurse called me at approximately 12:15 * * * that the man was in the emergency room * * * and I saw him * * * about 12:25, pronounced him dead." He expressed the conclusion that he was dead when he reached the hospital, and the nurse testified that he had no pulse at that time. "He had a few lacerations about the face, and he had an obvious fracture in his jaw;" that he did not make a complete examination of the deceased.

Dr. Fred Kallina, County Health Officer of Lubbock County, testified that on May 1, 1953, he performed an autopsy on the body of Gus L. Pierce and found external bruises over the entire body; that there were massive b r u i s e s over the entire scrotum; that there were numerous bruises and abrasions on the right leg, right ankle, right knee, and the left knee; that there were numerous abrasions on the right hand and right forearm; the left jaw bone was fractured and a half-inch laceration on the left side of the chin from one-fourth to one-half inches in depth; that there was a three-fourth inch incision into the right side of the mouth; there were numerous bruises on the right cheek and right jaw bone and underneath the right ear; there were lacerations on the forehead and right temple. There was a bruise one and one-half inches long and one inch across which was indented into the skull in the midline of the forehead near the vertex of the skull extending through the

tables of bone in the skull into the brain tissue; a bruise one inch wide and one and one-half inches long under the left ear; there was a wound on the back of the skull which extended into the brain tissue; and that there were indications of inter-cranial hemorrhage. He further testified that, in his opinion, the injuries to the forehead and on the back of the head caused the death of Gus L. Pierce, that is, death was caused by concussion.

Appellant testified that he and the deceased had been friends for several years and had been together frequently; that they, with others, engaged in several bowling games during the evening of April 30, 1953; that they drank some whisky during the time they were bowling; that an argument arose between he and the deceased about the marking of the score during which the deceased struck him twice, which disagreement they settled in a friendly manner; that they left the bowling alley in his automobile about 11:40 P.M., drove around to sober up the deceased, then to take him home; that they drank whisky twice along the road, after which the deceased said he was sick at which time appellant said "Well, Gus, if you are going to get sick, don't get sick in the car. Wait till I pull off here, and get outside the car;" that he drove off the highway near a service station, unlatched the door, and Gus got out, "took one or two steps and seemed to fall or lunge;" that he waited a few minutes, called Gus and, getting no response, investigated and found him breathing heavily on the ground; that he decided to take him to the hospital; that he thought his condition was due to drinking; that he himself was not entirely sober; that he fell with the deceased two or three times while getting him in the car and saw some blood on him; that on taking him out of the car at the hospital he said "I wouldn't say I dropped him, but I partly dropped and partly eased him down," and that someone helped him get Gus into the hospital. He further said that he and Gus were drinking, that some whisky was in the car, and that he wanted to avoid any unfavorable publicity for both, so he stated in answer to questions concerning the deceased that he didn't know what happened, but that he had picked him up out on the road; that he thought Gus was disabled from drinking and would soon be relieved, so he went home to explain to his wife and to get the whisky out of his car; that he washed his hands, changed his shirt and, after about twenty minutes, returned to the hospital; that he was asked at the hospital about what happened, but did not reveal anything because he and Gus had been drinking and he wanted to avoid all the adverse publicity he could, however, upon being told that they were officers

and that Gus was dead, he then told the truth about it all. He denied striking and beating the deceased in any manner.

Appellant's testimony further shows:

"In other words, Mr. McCallum, are you telling the jury, that to your best—best of your knowledge, the way all of those injuries, including the — all of those enumerated by Dr. Fred Kallina, came about — came on the body of this man, by his — merely you trying to get him in the car out there that night? A.   Well, I'm not trying to explain how they got there. I'm not — — I'd say either that, or the fact when he fell out of the car to begin with, where I wasn't even out there, between the two of them, it must of been, because no one else was with him, but me.

"Q.   In other words, from the time you left the bowling alley, 'till you got back to the West Texas Hospital, there was no one in your company — A.   No, sir."

The testimony of the grand jurors shows that they were unable to determine the means and manner of the acts which caused the death of Gus L. Pierce.

The nature and extent of the injuries inflicted, with the facts and circumstances surrounding the death of the deceased, are sufficient to authorize the jury to conclude that the death of the deceased was caused by violence inflicted by someone. Branch's Ann. P.C., Sec. 1890.

The court charged the jury upon the law of circumstantial evidence.

The jury was further charged that they must find "beyond a reasonable doubt that the defendant inflicted, or caused to be inflicted, the injuries which caused the death of the deceased," and if they had a reasonable doubt thereof to acquit.

The court further charged the jury that if they had a reasonable doubt as to whether the injuries causing the death of the deceased were intentionally inflicted by appellant to find him not guilty.

Appellant insists that the trial court should have charged the jury upon the issues of accident and negligent homicide in response to his timely objections to the court's charge.

The charge requiring a finding that the injuries were intentionally inflicted by appellant was appropriate and sufficient, and no error is here shown.

The cogent facts reveal the following: the disagreement at the bowling alley; that appellant and the deceased left there about 11:40 P.M. in appellant's automobile; that they drank some whisky at two different times and places while going six miles out on the highway; that appellant returned with the deceased to the hospital within thirty-five minutes from the time they left the bowling alley; that is, they arrived at the hospital at 12:15 A.M.; that at the hospital appellant said he did not know who the deceased was, that he picked him up out on the highway, and did not know what had happened to him; that he left the hospital within two or three minutes and returned about one hour later with a clean shirt on and blood on his ring; that he later told who the deceased was and what had happened to him; that he pointed out a place six miles out on the highway where he said deceased was injured; that articles belonging to appellant and the deceased were found at this place; and that appellant was the only person with the deceased from the time they left the bowling alley until they arrived at the hospital. The injuries inflicted to the front, back, and each side of the head, together with the numerous wounds and marks of violence on the body of the deceased cannot, in reason, be explained under appellant's version, but evidence a brutal and savage attack.

We are of the opinion that the facts and circumstances warrant the jury's finding that appellant, by some means unknown to the grand jury, voluntarily killed the deceased and exclude every other reasonable hypothesis.

The judgment of the trial court is affirmed.

Opinion approved by the court.

### ON MOTION FOR REHEARING

GRAVES, Presiding Judge.

Appellant offers as his main contention herein a claimed error upon the part of the trial court in that he did not charge upon an accidental killing.

The trial court did charge in Paragraph 7 of his charge that the jury were further instructed that before they could

convict the defendant they must first believe, beyond a reasonable doubt, that the defendant inflicted or caused to be inflicted the injuries which caused the death of the deceased. In Paragraph 8 of the charge the jury were told that if they had a reasonable doubt as to whether the injuries causing the death of the deceased were intentionally inflicted, or intentionally caused to be inflicted by the defendant, then they would find for the defendant and say by their verdict "not guilty." In Paragraph 9 the court further instructed the jury as a part of the law in this case that before they could find the defendant guilty of murder with malice or murder without malice, they must find from the evidence, beyond a reasonable doubt, that the defendant had a specific intent to kill, if they found beyond a reasonable doubt that the injuries causing the death of the deceased were inflicted by the defendant, otherwise, they should acquit the defendant and say by their verdict "not guilty."

We find ourselves at a loss to see where the appellant testified sufficiently to further raise the question of an accidental killing of the deceased. We quote from the appellant's own testimony relative to the time he claimed that the deceased fell out of the car some six miles out in the country, as follows:

"Q. In other words, when you saw him fall on his face, you didn't get out at that time? A. Not immediately. I didn't — — I didn't know that he'd fallen, particularly. I — it did seem like a sort of a lunge, but I couldn't see him. I was facing the other way and was busy with stopping the car and turning off the ignition. I — I —but he did — he took a step, I'm sure of that, and then he seemed to either fall or lunge. I — I —.

"Q. In other words, when you testified that he fell, you don't know whether he fell or not, do you? A. No, I really don't.

"Q. You don't know whether he hit his head on the ground or not, do you? A. No, sir, I really don't. I didn't see it. I couldn't see it."

We confess ourselves to be in doubt as to when the appellant intended to say that the deceased received these multiple injuries that were testifiied to by the doctor who performed the autopsy upon him. It seems that there were many extensive injuries and bruises over the whole body of the deceased. He had abrasions on his legs, and there were massive bruises over the entire scrotum. He had numerous bruises and abrasions on his right leg, his right ankle, his right knee, and left knee; also on his right hand, on his little finger, also on the right forearm

between the elbow and the wrist. There was a one and a half inch laceration on the left side of the chin which was very deep. There was a fracture of the left jaw bone. There was also another laceration at the right side of the mouth, and his lip was cut clear through the skin and into his mouth. There were bruises on the right cheek and right jaw bone, and lacerations on the forehead and right temple. All of these indicated that they were produced by a trauma, or physical force. There was one bruise in the midline of the forehead, a bruise on the back of his head, close to the right side of his forehead, about an inch and a half in length; also a large bruise, one and one-half inch long under the left ear. His ear was bruised and was black in color. There was a bruise on the back of his head. The brain tissue "was very swelled" and the bruise extended as far as a half inch deep into the brain tissue. The spinal fluid was bloody. The bruise on the right side of the midline of the forehead and the two bruises in the back part of the skull and "both would have been sufficient enough to have caused his death."

We confess that we are unable to see how these multiple injuries could have been inflicted upon the deceased by an accident not shown in the record.

We think that we were correct in our original opinion herein in holding that the different paragraphs heretofore set forth were sufficient to charge all of the defenses that appellant offered. Under the doctrine of circumstantial evidence and the charge of the court, we think the jury was justified in saying that in some manner unknown to them the appellant had intentionally caused the death of the deceased, and we are convinced that his rights were properly taken care of by the careful trial court in his instructions to the jury that they must find, beyond a reasonable doubt, that the appellant intended to take the life of the deceased before he could be convicted herein.

Thus believing, this motion for rehearing will be overruled.